Appeal No. 15-1939

# United States Court of Appeals

*for the*

# Federal Circuit

SOUTHWESTERN MANAGEMENT, INC.,

*Appellant,*

– v. –

OCINOMLED, LTD., EMERIL'S FOOD OF LOVE PRODUCTIONS, LLC,

*Appellees.*

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE

## BRIEF FOR APPELLANT

ROBERT E. PURCELL, ESQUIRE
THE LAW OFFICE OF
  ROBERT E. PURCELL, PLLC
*Attorneys for Appellant*
211 West Jefferson Street, Suite 24
Syracuse, New York 13202
(315) 671-0710

December 11, 2015

# **CERTIFICATE OF INTEREST**

Consistent with Federal Rule of Appellate Procedure 26.1 and Federal Circuit Rule 47.4, counsel for Southwestern Management, Inc. certifies the following:

1.   The full name of every party or amicus represented by me is:

Southwestern Management, Inc.

2.   The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

The real party in interest is the same as the party represented by me.

3.   All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Southwestern Management, Inc. is a privately-held company.  Palmetto Holding Corp., a privately held company, owns all of the stock of Southwestern Management, Inc.  There are no publicly-held companies that own 10 percent or more of the stock of Southwestern Management, Inc. or Palmetto Holding Corp.

4.   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

The Law Office of Robert E. Purcell, PLLC: Robert E. Purcell


Dated:  December 10, 2015          /s/Robert E. Purcell                        
                                   Robert E. Purcell
                                   *Counsel for Appellant*
                                   *Southwestern Management, Inc.*

# **TABLE OF CONTENTS**

CERTIFICATE OF INTEREST ................................................................ i

TABLE OF AUTHORITIES .......................................................... v-vii

STATEMENT OF RELATED CASES ............................................. viii

JURISDICTIONAL STATEMENT ...................................................1

STATEMENT OF THE ISSUES.........................................................1

STATEMENT OF THE CASE..............................................................2

STATEMENT OF THE FACTS ..........................................................3

    A. Southwestern's Noteworthy Use of the Term "DELMONICO'S" .................3

    B. Ocinomled's Noteworthy Use of the Term "DELMONICO'S" .....................7

    C. Emeril's Noteworthy Use of the Term "DELMONICO'S" ...........................8

SUMMARY OF THE ARGUMENT .................................................10

THE ARGUMENT INCLUDING A STATEMENT OF THE STANDARD OF REVIEW...........................................................................................16

    A. Overview...................................................................................16

    B. The Applicable Standard of Review ...............................................18

    C. More Detailed Argument ...............................................................19

      1. The TTAB Applied The Wrong Legal Standard.......................................19

      2. If The Proper Legal Standard Had Been Applied, Then Southwestern's Concurrent Use Application Would Have Been Approved For Registration....................................................................................20

      3. The TTAB's Analysis of A Likelihood of Confusion Is Both Errant And Exaggerated ...............................................................................25

      4. The TTAB Disobeyed The Statutory Mandate of 15 U.S.C. § 1067.........29

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ..............................30

ADDENDUM – DECISION(S) OF THE BOARD................................................A1

PROOF OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**CASES:**

*All Video, Inc v. Hollywood Entertainment Corp.*, 929 F. Supp. 262 (E. D. Mich. 1996) .................................................................................................................... 13

*Amalgamated Bank of New York v. Amalgamated Trust & Savings Bank*, 842 F.2d 1270 (Fed. Cir. 1988) .................................................................................... 27

*America's Best Franchising, Inc. v. Abbott*, Concurrent Use No. 94002407 (TTAB March 20, 2013) ................................................................................................ 14,27

*Beatrice Foods Co.*, 429 F.2d 466 (CCPA 1970) ..................................... 2-3,12,13,20,21

*Boi Na Braza, LLC v. Terra Sul Corpo*, Concurrent Use No. 94002525 (TTAB March 26, 2014) ............................................................................................ 15,18,27

*Burger King of Florida, Inc. v. Hoots*, 403 F.2d 904 (7th Cir. 1968) .......................... 15

*Carefirst of Maryland, Inc. v. First Health of the Carolinas, Inc.*, Opposition Nos. 91116355 and 91124847 (TTAB September 20, 2005) .............................................. 24,26

*CDS, Inc. v. ICED Management, Inc.*, 80 U.S.P.Q.2d 1572 (TTAB 2006) ............... 27

*Charles Greiner Co. v. Mari-Med Mfg.*, 962 F.2d 1031 (Fed. Cir. 1992) .................. 19

*Dial-A-Mattress Operating Corp. v. Mattress Madness*, 841 F. Supp. 1339 (E.D.N.Y. 1994) ...................................................................................................... 13

*Dickerson v. Zurko*, 527 U.S. 150 (1999) ................................................................. 18

*DuPont de Nemours & Co.*, 476 F.2d 1357 (CCPA 1973) ....................................... 2,3,20

*Enercon GmbH v. Int'l Trade Comm'n*, 151 F.2d 1376 (Fed. Cir. 1998) .................. 18

*Georgia-Southern Oil, Inc. v. Harvey Richardson*, Concurrent Use No. 756 (TTAB Sept. 10, 1990) ...................................................................................................... 17

*Hanna Financial, Inc. v. Hana Bank*, _ U.S. _, 135 S. Ct. 907, 2015 WL 248559 (2015) ................................................................................................................... 19

*Holiday Inns, Inc. v. Holiday Inn*, 364 F. Supp. 775 (D.S.C. 1973) .......................... 15

*Imazio Nursery, Inc. v. Dania Greenhouses*, 69 F.3d 1560 (Fed. Cir. 1995)..............18

*Independent Baking Powder Co. v. Boorman*, 175 F. 488 (C.C.D.N.J. 1910)............23

*Jim Henson Productions, Inc. v. John T. Brady & Associates, Inc.*, 34 U.S.P.Q.2d 1001 (S.D.N.Y. 1994)................................................................................................21

*Juice Generation, Inc. v. GS Enterprises LLC*, _ F.3d _, 2015 WL 4400033 (Fed. Cir. 2015)..............................................................................................................18

*Kappos v. Hyatt*, 566 U.S. _, 132 S. Ct. 1690 (2012)...................................................19

*Nark, Inc. v. Noah's, Inc.*, 212 U.S.P.Q. 934 (TTAB 1981)........................................ 15

*Pepsico, Inc. v. The Grapette Co., Inc.*, 416 F.2d 285 (8th Cir. 1969)........................23

*Sugar Busters LLC v. Brennan*, 50 U.S.P.Q.2d 1821, n. 4 (5th Cir. 1999).................21

*Terrific Promotions, Inc. v. Vanlex, Inc.*, 36 U.S.P.Q.2d 1349 (TTAB 1995)............27

*United States v. Lockheed*, 817 F.2d 1565, (Fed. Cir. 1987).......................................18

*Weiner King, Inc. v. Wiener King Corp.*, 615 F.2d 512 (C.C.P.A. 1980)................... 13,15

*YBM Magnex, Inc. v. Int'l Trade Comm'n*, 145 F.3d 1317, (Fed. Cir. 1998)............. 18-19

**FEDERAL STATUTES:**

5 U.S.C. § 706 (1994)..................................................................................................18

5 U.S.C. § 706(2)(A)................................................................................................... 24

15 U.S.C. § 1052(d)..................................................................................................... 1

15 U.S.C. § 1057(c) ................................................................................. 13

15 U.S.C. § 1067(a) ............................................................................ 1,29,30

15 U.S.C. § 1071(a)(1) ............................................................................ 1

15 U.S.C. § 1071(a)(2) ............................................................................ 1

28 U.S.C. § 1295(a)(4)(B) ....................................................................... 1

**FEDERAL REGULATIONS:**

37 C.F.R. § 42.62(a) ................................................................................ 22

**OTHER AUTHORITIES:**

TBMP § 527.01 ........................................................................................ 24

## STATEMENT OF RELATED CASES

Consistent with Federal Circuit Rule 47.5, counsel for Appellant, Southwestern Management, Inc., provides the following Statement of Related Cases:

(a)     There has been no appeal, known to counsel, in or from the same civil action or proceeding in the lower court or body previously before the Federal Circuit or any other appellate court.

(b)     There is no case, known to counsel, pending in this or any other court, that will directly affect, or be directly affected by, this Court's decision in this appeal.

## JURISDICTIONAL STATEMENT

The Trademark Trial and Appeal Board had jurisdiction over this trademark concurrent use proceeding pursuant to 15 U.S.C. § 1067(a).  On June 11, 2015, the Board issued a final decision refusing to issue a restricted concurrent use registration to Southwestern Management, Inc. (hereinafter "Southwestern"). J.A. 1-57.  On July 8, 2015, Southwestern filed a notice of appeal to this Court within the 60 days prescribed by 15 U.S.C. § 1071(a)(2). J.A. 67.  As such, this Court has jurisdiction over this appeal pursuant to 15 U.S.C. § 1071(a)(1) and 28 U.S.C. § 1295(a)(4)(B).

## STATEMENT OF THE ISSUES

1.     Whether the Board erred by applying an improper standard for determining whether Southwestern's concurrent use application satisfies the requirements of 15 U.S.C. § 1052(d).

2.     Whether, by applying the proper standard under § 1052(d), Southwestern's concurrent use application should have been approved for registration.

3.     Whether the Board obeyed the statutory mandate of 15 U.S.C. § 1067 to determine and decide the parties' respective rights of registration.

4.     Whether the Board properly decided several evidentiary objections to be addressed in the final decision.

## STATEMENT OF THE CASE

On July 3, 2003, Southwestern filed an application for federal trademark registration of "DELMONICO'S" for "restaurant services." J.A. 68-79. The application was approved by the Examining Attorney, was published for opposition on September 26, 2005, and was the subject of oppositions brought by two different entities, Ocinomled, Ltd. (hereinafter "Ocinomled"), and Emeril's Food of Love Productions, LLC (hereinafter "Emeril's"). J.A. 80-90. Southwestern consented to the entry of judgment against itself in connection with the opposition proceedings and amended its application to seek concurrent use J.A. 102-117, which led to the concurrent use proceeding at issue on this appeal. Southwestern sought a restricted registration identifying as excepted users Ocinomled within a "forty mile radius around the Empire State Building in New York, New York," and Emeril's within a "forty mile radius around the Superdome in New Orleans, Louisiana, and a forty mile radius around the Stratosphere in Las Vegas, Nevada." J.A. 3786.

Normally, the likelihood of confusion standard in determining rights to a federal trademark registration applies the well-known *DuPont* factors, such as the similarity between the parties' respective marks and goods/services. *In re DuPont de Nemours & Co.*, 476 F.2d 1357 (CCPA 1973). However, in the context of concurrent use proceedings, this Court recognized in *In re Beatrice Foods Co.*, 429

F.2d 466 (CCPA 1970) and in other decisions that a different standard for determining a likelihood of confusion in allocating territories of concurrent use must be used. Here, the TTAB gave improper emphasis to the *DuPont* factors and errantly gave minimal respect to the *Beatrice* standard, which the TTAB wrongfully viewed as "very much subordinate" to the *DuPont* factors.

When the proper standard is applied. Southwestern will have demonstrated its right to have its concurrent use application issue to registration.

## STATEMENT OF THE FACTS

There are three parties to the instant concurrent use proceeding. Southwestern will succinctly describe the noteworthy uses of the parties' respective trademarks.

### A. Southwestern's Noteworthy Use of the Term "DELMONICO'S"

John Wade, Sr. and John Wade, Jr. are the principals of companies that own and operate "DELMONICO'S" restaurants in Upstate New York and Orlando, Florida. J.A. 4742-4743; J.A. 4746-4747; J.A. 4749-4750; J.A. 4854-4855; J.A. 4856; J.A.4858; J.A. 4564; J.A. 4565. J.A. 4520. The Wades, both of whom had extensive experience in the restaurant business, wanted to open a restaurant that had an Italian theme and that highlighted steaks. J.A. 4739; J.A. 4741; J.A. 4746; J.A. 4516-4518. They wanted the signature item on the restaurant menu to be a one and one-half pound rib eye steak a/k/a Delmonico cut steak. J.A. 4741. They

originally thought of naming the restaurant with a fictitious Italian man's name, "Joey Delmonico," and then thought of adding a possessive "'s" after the name, which would fit with the Italian theme of the restaurant. J.A. 4741; J.A. 4740. Eventually just the term "DELMONICO'S" was selected. J.A.4741. This term had been selected most likely by late 1997, and definitely by early February 1998. J.A. 4620; J.A. 4223; J.A. 4225; J.A. 3720-3721; J.A. 3723-3724. The name selection was not influenced by any prior use of that mark or any similar mark by any third party, and particularly, at the time of selecting and adopting "DELMONICO'S", neither of the Wades was aware of the uses of similar marks by any alleged predecessor-in-interest of either of the other parties. J.A. 4786; J.A. 4575. Although John Wade, Sr. had been vaguely aware that there was, at some point, a Delmonico's restaurant in New York City, he had been told it had closed down. When he called directory assistance for New York City in 1997, there was nothing listed for "DELMONICO'S". J.A. 4620-4623. In fact, at the time of the Wades' selection and adoption of the trademark "DELMONICO'S", neither Ocinomled nor Emeril's nor any of their alleged predecessors-in-interest were operating any restaurant under DELMONICO'S or DELMONICO.

The Wades opened "DELMONICO'S" restaurants at the following upstate New York locations: J.A. 4747; J.A. 4531.

-4-

| Restaurant Location | Approximate Opening Date |
|---|---|
| Syracuse, New York | May 1998 |
| Albany, New York | October 2000 |
| Utica, New York | March 2003 |
| Rochester, New York | October 2005 |

Each of the foregoing restaurants has been continuously and successfully operated since its opening. J.A. 4747; J.A. 4788; J.A. 3903-3906. The first restaurant, at the Syracuse location, opened to the public on May 16, 1998. J.A. 4744; J.A. 4521-4523; J.A. 4227; J.A. 3725; J.A. 3752-3753; J.A. 4884-4889.

The Wades also expanded to open a "DELMONICO'S" restaurant in Orlando, Florida.  As of March 16, 2011, they were finalizing construction of the Orlando location, had hired all of their employees, and were planning to open the restaurant to the public on April 4, 2011 J.A. 4783-4785. -- a few days after the close of the TTAB's trial testimony period. Although not part of the record, the Orlando restaurant has, in fact, opened to the public and continues in successful operation.

Even though the restaurants' floor plans are somewhat different because they were all converted from other restaurants, the restaurants' décor, personality, and feel are, and always have been, very similar because all of the restaurants have caricatures on the walls, have dark wood and red upholstery, and play music from

Italian singers from the 1940s and 1950s such as Frank Sinatra, Tony Bennett, and Dean Martin. J.A. 4750-4752; J.A. 4531-4533. Since their openings, all of the restaurants have shared the same menu, and the staff has worn the same attire at all of the restaurants. J.A. 4750-4752; J.A. 4531-4533.

The customer count and the total food and beverage sales revenues for only the calendar year 2007 for just the four then-operating "DELMONICO'S" restaurants totaled 600,000 customers and about $15 million in revenue. J.A. 4786-4788; J.A. 4533-4534; J.A. 3901-3906.

In addition to advertising "DELMONICO'S" restaurants through a host of major local newspapers, J.A. 4761-4771; J.A. 4550-4557; J.A. 4568; J.A. 4890-4909. radio stations, J.A. 4759-4760; J.A. 4568-4571. and television stations in the four-above mentioned cities, J.A. 4753-4755; J.A. 4761; J.A. 4548-4550; J.A. 4890-4909. the restaurants have been advertised on billboards, J.A. 4757-4760; J.A. 4527-4530. through gift certificates, J.A. 4773-4774; J.A. 4559-4561; J.A. 4890-4909. and through the website www.delmonicositaliansteakhouse.com. J.A. 4762-4763; J.A. 4778-4779; J.A. 4564-4565; J.A. 4910-4925. Southwestern has also sponsored the famous Syracuse University men's basketball coach, Jim Boeheim, on his own special radio show regularly on Thursdays, which was broadcast from the Syracuse restaurant by a radio station based in Syracuse, New York from 1999 or 2000 to 2009. J.A. 4780-4783; J.A. 4572-4574.

On July 3, 2003, Southwestern filed an application for federal trademark registration of "DELMONICO'S" for "restaurant services." J.A. 4926-4932.

### B. Ocinomled's Noteworthy Use of the Term "DELMONICO'S"

Ocinomled (note that "Ocinomled" is the term "Delmonico" spelled backwards) has operated a restaurant known as "DELMONICO'S" located at 56 Beaver Street in lower Manhattan in New York City. J.A. 5618-5619. The New York Secretary of State's records indicate that Ocinomled was not formed until July 29, 1999. J.A. 4340; J.A. 5631; J.A. 4470. Ocinomled opened the Delmonico restaurant at 56 Beaver Street to the public in September 1999. J.A. 5650-5651. There was no evidence in this proceeding that Ocinomled has any restaurant revenue figures prior to the year 1999.

Ocinomled claims that it can tack on trademark rights in the term "DELMONICO'S" for restaurant services through Cibe Beaver, LLC ("Bice Group"), the prior owner of the Delmonico's restaurant operated at 56 Beaver Street. J.A. 807-809. Ocinomled claims that the Bice Group opened its Delmonico restaurant at that location sometime in May 1998. J.A. 5643-5644. However, Ocinomled has presented no testimony from anyone affiliated with the Bice Group or any other witness who has personal knowledge of when the Bice Group opened its restaurant. Ocinomled has attempted to establish when the Bice Group opened the restaurant through unauthenticated documents, but has failed to provide any

admissible evidence in support of its contentions.

Southwestern maintains that Ocinomled did not carry its burden of showing its entitlement to tack on trademark rights.

### C. Emeril's Noteworthy Use of the Term "DELMONICO"

Emeril's was formed on December 9, 1999. J.A. 4339; J.A. 4425-4426; J.A. 4467. Emeril's claims concurrent rights based on a "DELMONICO" restaurant on St. Charles Street in New Orleans, Louisiana, which operated under an entity related to Emeril's and which opened to the public on June 1, 1998. J.A. 1953. Emeril's also claims concurrent rights based on the operation of a "DELMONICO STEAKHOUSE" restaurant that opened at the Venetian Hotel in Las Vegas, Nevada in May 1999. J.A. 1968.

Emeril's contends that it may tack on rights in the trademark "DELMONICO" going back to 1895, when a restauranteur in New Orleans allegedly asked permission from the owner then-operating the Delmonico's restaurant in New York City for permission to open a "DELMONICO" restaurant in New Orleans. J.A. 206-216.

In the mid-1990s, the La Franca sisters operated the "DELMONICO" restaurant on St. Charles Street in New Orleans, which allegedly had its roots going back to 1895. The restaurant had a difficult time achieving profitability, and closed its doors and ceased operations on Lundi Gras in 1997 (the Monday before

Mardi Gras, which occurred on February 10, 1997). J.A. 2797; J.A. 2977-2979; J.A. 312; J.A. 314.  During the Mardi Gras parade on "Fat Tuesday," February 11, 1997, one of the local bands played the song "Taps" in front of the empty, defunct restaurant – a ceremony befitting a death and a funeral. J.A. 3233-3254. A few weeks **thereafter**, the prior restaurant owner, by a document entitled "Sale and Assignment of Movables and Trade Name" dated effective March 3, 1997, sold some, but not all, of the furniture, fixtures, and equipment, and the "name or likeness, trademark, and trade name identified as 'DELMONICO'" to Emeril, LLC, not the Emeril's entity involved with the instant concurrent use proceeding. J.A. 2799-2802; J.A. 3187-3192. The Louisiana Secretary of State's records indicate that Emeril, LLC was not formed until February 26, 1997 – significantly, after the "DELMONICO" restaurant had been shut down and closed. J.A. 4419.

The premises of the old "DELMONICO" restaurant at St. Charles Street underwent a "total renovation" costing more than $4 million. J.A. 2819; J.A. 320; J.A. 886. On June 1, 1998, more than one year after the "DELMONICO" restaurant closed its doors on February 10, 1997, "a totally different restaurant" opened at the same location under the name "DELMONICO." J.A. 2826; J.A. 316; J.A. 320-321; J.A. 324-326; J.A. 328-330. Mr. Lagasse, the principal of Emeril's testified:

> Q.    Did the prices change from the old restaurant to your restaurant?

A.     Some.

Q.     How?

A.     It was a totally different restaurant.

Q.     When you say 'it is a totally different restaurant,' what do you mean?

A.     Well, I mean the decor, the style of service, the ambience. We're talking about a cup of soup costing 69 cents and one costing $16.  There is a little different style of restaurant.  Not to be perceived snooty, it was just, you know, the way that I sort of believe in how the restaurant should be and fit and the style of restaurant that I wanted it to be a part of New Orleans.

J.A. 328. In addition, the menu at the new restaurant was different, the prices were considerably higher, and, in contrast to the restaurant operated by the LaFranca sisters, everything was made from scratch. J.A. 327-330; J.A. 337. As one New Orleans journalist wrote after the new restaurant opened: "There is no continuity beyond name and address with the old Delmonico.  It was a charming, old-fashioned, but somewhat tired throwback, and I loved it.  But it had to be reinvented, and it was." J.A. 359.

Southwestern maintains that Emeril's did not carry its burden of showing its entitlement to tack on trademark rights.

## SUMMARY OF THE ARGUMENT

Southwestern submits that Ocinomled can, at best, demonstrate that it has rights in the trade name and trademark "DELMONICO'S" extending back only to

-10-

September 1999 in connection with restaurant services. Southwestern also submits that Emeril's can, at best, establish trade name and trademark rights in "DELMONICO" extending back to June 1998. Accordingly, Southwestern, which opened its first "DELMONICO'S" restaurant to the public on May 16, 1998, is the first, senior user of the trademark "DELMONICO'S"/"DELMONICO" in connection with restaurant services. Moreover, there is no dispute that Southwestern was the first to file an application for federal registration of that trademark in connection with restaurant services.

Southwestern also notes that it is the only one of the three entities that has continued to expand its restaurant locations, having established new restaurants in 2000, 2003, 2005, and a relatively recent new location in Orlando, Florida in 2011. The record reflects that Ocinomled has been stagnant at its 56 Beaver Street location in lower Manhattan since 1999. Although Emeril's was involved in opening a "DELMONICO STEAKHOUSE" restaurant in the Venetian Hotel in Las Vegas, Nevada in 1999, Emeril's has not opened any new "DELMONICO" restaurants since then. Moreover, there was no evidence in the concurrent use proceeding that either Ocinomled or Emeril's had any concrete plans or intentions to expand beyond their current locations.

The law with regard to deciding the geographic territory in which one concurrent user may use its trademark exclusively vis-à-vis another concurrent

user historically relies heavily on three factors: which entity is the first, senior user of the mark, the degree to which each entity has or has not expanded the use of its mark, and which entity was first to seek federal registration of that mark.  These factors favor Southwestern.

The seminal case of *In re Beatrice Foods Co.*, 429 F.2d 466 (C.C.P.A. 1970) held that in a normal case in which neither party owns a federal registration, the general rule is that the senior user is *prima facie* entitled to a registration covering the entire United States, subject to an exception only in proven areas of use by the junior user. That is, the senior user is entitled to a registration covering the entire nation, including areas of its use and non-use, subject only to the exception of areas in which the junior user shows use or the strong probability of use. The *Beatrice Foods* case also recognized the important factor of encouraging trademark owners to apply promptly for federal registration of their trademarks, and noted that where a junior user obtains a federal nationwide registration and thereafter a senior user institutes a concurrent use proceeding, the junior user registrant may retain nationwide protection subject only to the territory of the prior, senior use. Southwestern submits that the same rationale should be applied where, as here, Southwestern was the first party to apply for a federal trademark registration of the trademark "DELMONICO'S" in connection with restaurant services and its registration was thwarted only because Ocinomled and Emeril's filed oppositions

to its application.

Even if Southwestern were a junior user, the fact that it was the first to file an application for federal trademark registration should freeze any senior user's rights under the current effect of the Lanham Act. The *Beatrice Foods* case was decided before the 1988 amendments to the Lanham Act provided for constructive nationwide use as of the filing date of an application for registration that eventually issues to registration, instead of constructive nationwide notice as of the (later) registration issue date. 15 U.S.C. § 1057(c). Such amendments strongly support freezing the territory of the non-applicant's trademark rights as of the date of filing an application for federal trademark registration.

There is a public policy of rewarding those who first ***seek*** federal trademark registration. *Weiner King, Inc. v. Wiener King Corp.*, 615 F.2d 512 (C.C.P.A. 1980); *Dial-A-Mattress Operating Corp. v. Mattress Madness*, 841 F. Supp. 1339 (E.D.N.Y. 1994), *recons. denied*, 847 F. Supp. 18 (E.D.N.Y. 1994), *opinions combined at* 33 U.S.P.Q.2d 1961 (E.D.N.Y. 1994). *See also, All Video, Inc v. Hollywood Entertainment Corp.*, 929 F. Supp. 262, n.5 (E. D. Mich. 1996) (citing McCarthy's treatise and concluding that, for a post 11/16/89 application for federal trademark registration, a non-applicant's rights were frozen as of the date of filing the application, not the date of registration; a non-applicant's stores that were opened after the application filing date cannot continue to use the trademark.) The

policy cannot be so fickle as to apply if an adverse party petitions to cancel a registration one day after the registration issues, but not apply if the party were to have opposed the registration prior to issuance.

Even presuming *arguendo* that Ocinomled or Emeril's was a first user, courts have recognized that through prolonged inaction, the first user may have lost any right to expand beyond its trade territory. As the TTAB stated in *America's Best Franchising, Inc. v. Abbott*, Concurrent Use No. 94002407 (TTAB March 20, 2013):

> In fact, through inaction over a considerable period of time, a prior user may have given up the right to expand use of its mark outside of its trading area and,
>> in effect, abandoned or relinquished the right as a prior user to expand into a particular area or the right to enjoy nationwide protection for its mark as a result of inactivity over a reasonable period of time, which would be indicative of a static business ….
>
> *Nark, Inc.*, 212 USPQ at 944 (quotation omitted); *see also Noah's, Inc. v. Nark, Inc.*, 560 F. Supp. 1253, 222 USPQ 697, 701 (E.D. Mo. 1983), *aff'd*, 728 F.2d 410 (8th Cir. 1984).

Southwestern believes that the forty mile radii set forth as exceptions to its concurrent use application are sufficiently broad to encompass the effective trade territory of Ocinomled and Emeril's restaurants. Although naturally all of the parties, including Southwestern, may emphasize that many of their customers come from more remote geographic regions, Southwestern submits that the forty mile radius region is appropriate when considering the "bricks and mortar" location of a restaurant. Courts have held that such a radius is more than ample in

-14-

the context of restaurant and hotel businesses. *Weiner King, Inc. v. The Weiner King Corp.*, 615 F.2d 512 (C.C.P.A. 1980) (the rights of a static senior user were restricted to a 15-mile radius surrounding its existing restaurants in view of an expanding junior user registrant.) *Burger King of Florida, Inc. v. Hoots*, 403 F.2d 904 (7th Cir. 1968) (where the defendant had first used the BURGER KING mark for restaurant services after the plaintiff's first use, but before the plaintiff's federal registration, and the defendant had obtained an Illinois State trademark registration, the defendant's right to use the mark was restricted to a twenty-mile radius around Martoon, Illinois); *Holiday Inns, Inc. v. Holiday Inn*, 364 F. Supp. 775 (D.S.C. 1973), *aff'd*, 182 U.S.P.Q. 129 (4th Cir. 1974) (hotel operating in the nationally famous resort area of Myrtle Beach, South Carolina was restricted to rights extending only to Myrtle Beach, South Carolina). *Nark, Inc. v. Noah's, Inc.*, 212 U.S.P.Q. 934 (TTAB 1981) (static senior user/applicant operating a single restaurant was limited to the territory of Des Moines, Iowa while an expanding junior user was granted registration for all of the United States other than the excepted territory.)

As the TTAB itself recently held in *Boi Na Braza, LLC v. Terra Sul Corpo*, Concurrent Use No. 94002525 (TTAB March 26, 2014):

> **Moreover, the Board and other tribunals have often found that confusion can be avoided when restaurant services in particular are offered under identical marks but in geographically restricted territories.** *See, e.g., Weiner King*, 204 USPQ 820 (permitting concurrent

registration of WIENER KING with and without design for hot dog restaurants and WEINER KING with and without design for hot dog restaurants in separate geographic territories); *Pinocchio's Pizza Inc. v. Sandra Inc.*, 11 USPQ2d 1227 (TTAB 1989) (permitting concurrent registration of PINOCCHIOS for restaurant services featuring pizza and PINOCCHIO'S for restaurant services in separate geographic territories); *Nark, Inc.*, 212 USPQ 934 (granting registration for NOAH'S ARK for restaurant services nationwide except for 20-mile radius around each of four restaurants using similar marks in different states); *see also Brennan's, Inc. v. Brennan's Rest., LLC*, 360 F.3d 125, 69 USPQ2d 1939 (2d Cir. 2004) (finding no likelihood of confusion between Brennan's restaurants in New Orleans and New York). **Restaurant services by definition are rendered in a particular geographic location.** *Cf. America's Best*, 106 USPQ2d at 1550, 1552.

**Our conclusion is not changed by the fact that the parties' advertising has overlapped.**

**Overlapping advertising and customer solicitation does not require a determination that there is a likelihood of confusion.** *CDS Inc. v. I.C.E.D. Mgmt., Inc.*, 80 USPQ2d 1572, 1583 (TTAB 2006) (construing *Amalgamated Bank of New York v. Amalgamated Trust & Sav. Bank*, 842 F.2d 1270, 6 USPQ2d 1305 (Fed. Cir. 1988)). **Nor does the fact that both parties have a presence on the Internet.** *America's Best*, 109 USPQ2d at 1551-52.

(emphasis added.) Here, the TTAB inexplicably, unjustifiably, and errantly deviated from this widespread, long-standing, and well-established precedent.

## THE ARGUMENT INCLUDING A STATEMENT OF THE STANDARD OF REVIEW

### A. Overview

Many of the basic, important facts are undisputed:

- It is undisputed that Southwestern was the first to seek registration for its trademark for restaurant services.

- As of the close of testimony, Southwestern had steadily opened additional restaurants under its trademark since its original restaurant opened in May of 1998 and had expanded from the Upstate New York area to Orlando, Florida, where it had signed a lease, was finalizing construction, had hired all of its employees, and was planning to open the restaurant a few days after the close of testimony.

- As of the close of testimony, Ocinomled had never expanded beyond the sole restaurant in New York City that it has operated since 1999.

- As of the close of testimony, Emeril's had never expanded beyond the restaurant opened in New Orleans in 1998 and a second restaurant opened in Las Vegas in 1999.

- There is no actual evidence of confusion between Southwestern's restaurant services and those of either of the concurrent users despite many years of concurrent use, advertising, and promotion and despite millions of customers.[1]

---

[1] The decision (at p. 51) J.A. 51 mentions a single instance of alleged actual confusion involving Southwestern, which concerned an inquiry from a couple as to whether Southwestern's DELMONICO'S restaurant was related to the Emeril's DELMONICO restaurant.  However, such inquiries do not constitute actual confusion. *Georgia-Southern Oil, Inc. v. Harvey Richardson*, Concurrent Use No. 756 (TTAB Sept. 10, 1990) (A customer who wondered if there was a connection, aside from the hearsay problem, falls short of a probative showing of actual confusion.) The coexistence of parties over a long time with no credible evidence

Although Ocinomled and Emeril's dispute their dates of first use, Southwestern did and will demonstrate that Southwestern is the senior user.

## B. The Applicable Standard of Review

A reviewing court *must* set aside any agency actions, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence". 5 U.S.C. § 706 (1994);  *see also*, *Dickerson v. Zurko*, 527 U.S. 150, 164-65 (1999).

The TTAB's ultimate conclusion regarding a likelihood of confusion (presuming the application of a proper standard) is a question of law reviewed *de novo*. *See, e.g., Juice Generation, Inc. v. GS Enterprises LLC*, _ F.3d _, 2015 WL 4400033 (Fed. Cir. 2015).

Issues of statutory construction and issues in interpreting regulations are matters of law reviewed *de novo*. *See, e.g., Imazio Nursery, Inc. v. Dania Greenhouses*, 69 F.3d 1560, 1562 (Fed. Cir. 1995) and *United States v. Lockheed*, 817 F.2d 1565, 1567 (Fed. Cir. 1987), while a statutory or regulatory interpretation by an agency is "given deference". *See, e.g., Enercon GmbH v. Int'l Trade Comm'n*, 151 F.2d 1376, 1381 (Fed. Cir. 1998).

The meaning or interpretation of legal precedent is a matter of law to be reviewed *de novo*. *See, e.g., YBM Magnex, Inc. v. Int'l Trade Comm'n*, 145 F.3d

---

of actual confusion "weights against a finding that there is a likelihood of confusion in geographically restricted territories." *Boi Na Braza, supra.*

1317, 1320 (Fed. Cir. 1998).

A reviewing court "cannot meaningfully defer to the PTO's factual findings if the PTO considered a different set of facts." *Kappos v. Hyatt*, 566 U.S. _, 132 S. Ct. 1690 (2012).

The issue of "tacking" of rights based on prior trademark areas is a matter of fact, reviewable under the "unsupported by substantial evidence" standard. *See, e.g., Hanna Financial, Inc. v. Hana Bank*, _ U.S. _, 135 S. Ct. 907, 2015 WL 248559 (2015).

The issue of abandonment of trademark rights is a matter of fact, reviewable under the "unsupported by substantial evidence" standard. *See, e.g., Charles Greiner Co. v. Mari-Med Mfg.*, 962 F.2d 1031, 1034-35 (Fed. Cir. 1992).

## C. More Detailed Argument

### 1. The TTAB Applied The Wrong Legal Standard

The TTAB failed to acknowledge the long-established precedence that in all concurrent use situations involving the scope of geographic rights, especially those involving bricks and mortar businesses such as restaurants and hotels, the courts have set geographic boundaries, knowing that advertising and (mobile) customers virtually invariably cross those boundaries and knowing that one user might set up a business within one mile of the boundary and the other user might set up a business within one mile on the other side of the boundary -- less than two miles

-19-

apart. The likelihood of confusion standard in such scenarios places little weight on the *DuPont* factors, some of which are essentially meaningless in a concurrent use context. Rather, as for example in the *Beatrice Foods* decision, the courts place great weight on the factors of which party was first to apply for federal registration, which party was the first user, and the degree to which each party has expanded its trademark use.

Here, the TTAB concluded without citation to any support or precedence, and indeed contrary to such precedence, that the *Beatrice Foods* standard of a policy favoring the first to register or apply for registration "is treated as a factor that is very much subordinate to the statutory considerations of whether confusion is likely." (see p. 37 of the decision) J.A. 37.

The TTAB junked the standards associated with *Beatrice Foods* and other long-standing precedent, and stated "Our determination under Section 2(d) is based on an analysis of all probative facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion, as set forth in [*DuPont*]." (see p. 38 of the decision) J.A. 38.

The TTAB applied the wrong legal standard.

## 2. If The Proper Legal Standard Had Been Applied, Then Southwestern's Concurrent Use Application Would Have Been Approved For Registration

As previously mentioned, all of the basic, important factors favor Southwestern. Regarding the issue of which entity is the first, senior user,

Ocinomled and Emeril's contend that their dates of first use predate Southwestern's date of first use of May 16, 1998. The TTAB contrived its evidentiary rulings and rendered a perverted review of the evidence in accommodating their contentions -- in an illegitimate effort to try to distance this case from the *Beatrice Foods* standard.

With regard to Ocinomled's date of first use, Ocinomled maintains that, although it commenced operations of its restaurant in New York City in September 1999, it is allegedly entitled to "tack on" the trademark rights of its alleged predecessor-in-interest to assert a date of first use in May, 1998. Ocinomled has the burden of showing that it is entitled to succeed to any rights of an alleged predecessor-in-interest. *See, e.g., Jim Henson Productions, Inc. v. John T. Brady & Associates, Inc.*, 34 U.S.P.Q.2d 1001 (S.D.N.Y. 1994); *Sugar Busters LLC v. Brennan*, 50 U.S.P.Q.2d 1821, n. 4 (5th Cir. 1999). Ocinomled offers no evidence by anyone with first-hand knowledge regarding the predecessor-in-interest's purported use of the trademark in the May, 1998 time frame. Ocinomled did not even take discovery or testimony of its predecessor-in-interest in an attempt to establish such use. Instead, Ocinomled relies on a plaque or proclamation, a certificate of occupancy, and press clippings. However, Southwestern objected to such evidence as being inadmissible because it lacks authentication and foundation, and constitutes hearsay. J.A. 5885. Instead, these documents appear to

have been found during these concurrent use proceedings when attorneys or other persons affiliated with Ocinomled rummaged around the internet for some old documents that might have a bearing on the alleged predecessor-in-interest's use of the trademark. *Id.*

The Federal Rules of Evidence are to be applied in TTAB proceedings. 37 C.F.R. § 42.62(a). The TTAB decision (at pp. 7-8 and 21-22) J.A. 7-8, 21-22. overruled Southwestern's objection as to the certificate of occupancy and the newspaper clippings, stating they are admissible without authentication for what they show on their face. A certificate of occupancy is of course needed before opening a business, but does not establish when the business was later opened. No one testified that the alleged newspaper articles were in fact published or reviewed on a date in May of 1998. Moreover, the TTAB went even further and relied on the statements of some purported author of the article, often allegedly quoting yet another person, despite the hearsay character of those statements. In wrongful reliance upon such exhibits, the TTAB found that Ocinomled's first date of use was a couple of days before that of Southwestern.

With regard to the Emeril's date of first use, the TTAB completely ignored Southwestern's factual presentation and arguments that Emeril's could not tack on the prior rights of the prior restaurant owners, the LaFranca sisters, because (1) the DELMONICO mark had been abandoned ("cessation of use with no intent to

resume use") prior to Emeril's acquisition of the restaurant property, and (2) the character of the restaurant operations had so radically changed from that under the LaFranca sisters that the mark lost its significance of an established quality of restaurant services.[2] Again, Emeril's had the burden of showing it was entitled to tack on the rights of any predecessor-in-interest.

Southwestern devoted over three pages of its trial brief (pp. 11-14) J.A. 3796-3799. and over five pages of its twenty-one page reply brief (pp. 9-14) J.A. 5889-5894. addressing these issues regarding Emeril's illegitimate attempt to tack on the rights of the La Franca sisters. The TTAB decision is completely devoid of any recognition, much less any analysis, of these issues.

This insidious defect in the TTAB decision came about either through utter incompetence, or more likely, through intellectual dishonesty in an attempt to steer the facts to support a predesigned conclusion. Such action was arbitrary and capricious and demonstrates a judicial corruption underlying and pervading the entire TTAB decision. Since, this Court "**shall** … hold unlawful and set aside

---

[2] The assignment of a trademark and its goodwill (with or without tangibles or intangibles being assigned) requires the mark itself be used by the assignee on a product or service having substantially the same characteristics. *See, e.g.*, *Pepsico, Inc. v. The Grapette Co., Inc.*, 416 F.2d 285 (8th Cir. 1969)(trademark rights do not extend back to assignor's use of the mark on a cola flavored syrup for soft drinks where assignee used the mark on a pepper flavored soft drink.); *Independent Baking Powder Co. v. Boorman*, 175 F. 488 (C.C.D.N.J. 1910)(trademark rights forfeited where mark for baking soda was used by assignee who substituted phosphate for alum).

agency action, findings, and conclusions found to be arbitrary, capricious, and abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (emphasis added), Southwestern asks that the entire decision be set aside on this basis alone.

In response to an interrogatory asking for an identification of "any persons or entities that have authorized, licensed . . . granted or otherwise conveyed any right to use DELMONICO Marks, and describe in detail the nature of each such conveyance separately," Emeril's did not identify any such person or entity, but rather, said that the answer would be found in documents that it was concurrently producing. J.A. 223-230. Such documents reference only the March 3, 1997 and the November 9, 2007 transactions. Also, in response to an interrogatory asking Emeril's to describe in detail the circumstances by which it became aware of the use of such trademark by any other person, Emeril's again failed to identify any alleged predecessor-in-interest respecting such trademark. J.A. 223-230. Emeril's should be estopped and precluded from relying on trademark uses and rights of an alleged predecessor-in-interest when it failed to reveal that information in connection with interrogatories encompassing a request for that information. *Carefirst of Maryland, Inc. v. First Health of the Carolinas, Inc.*, Opposition Nos. 91116355 and 91124847 (TTAB September 20, 2005); TBMP § 527.01. Unsurprisingly, the TTAB not only gave Emeril's a pass on its interrogatory

responses, it also permitted Emeril's to produce immediately before its trial

testimony depositions mounds of documents that had previously been formally

requested through discovery and at the time of the discovery had been in existence

-- all over Southwestern's and Ocinomled's objections.

For the reasons set forth at length in Southwestern's trial brief, which were

completely ignored by the TTAB, and reply brief Emeril's date of first use is in

June of 1998 -- subsequent to Southwestern's date of first use.

### 3. The TTAB's Analysis of A Likelihood of Confusion Is Both Errant And Exaggerated

The TTAB found that neither of Ocinomled's nor Emeril's

DELMONICO/DELMONICO'S marks was famous. Nevertheless, the TTAB

vaguely (and erroneously) determined that the Emeril's DELMONICO mark's

"reputation has spread throughout a substantial portion of the United States." (see

p. 50 of decision) J.A. 50. and also vaguely (and errantly) determined that

Ocinomled's "DELMONICO'S mark has a fairly wide spread reputation and that

its reputation is particularly strong in New York City." (p. 55 of the decision) J.A.

55. The TTAB fails to delineate any definition of or standard for determining

whether or how "reputation" is to be distinguished from "fame", fails to offer any

analysis or conclusion regarding the relevant market or populace to which the

"reputation" supposedly attaches, fails to offer any analysis or conclusion

regarding the amount or degree of saturation of the relevant populace to which the

"reputation" supposedly attaches, fails to analyze or discuss when such supposed reputation arose or the degree to which it might continue, fails to articulate the exact geographic parameters of such supposed reputation, and fails to discuss any brand recognition surveys, and fails to appreciate the important distinctions between exposure to a trademark and lingering, engrained (re)cognition of that trademark.

Guidance regarding the extreme weight of evidence needed to establish a national reputation/fame were set forth in the recent TTAB decision *Carefirst of Maryland, Inc. v. FirstHealth of the Carolinas, Inc.*, Opposition Nos. 91116355 and 91124847 (TTAB September 20, 2005). The TTAB found an insufficient showing of such national reputation/fame where the party had insured millions of individuals under the trademark, had received insurance premium payments in the billions of dollars, had advertising expenditures relating to the trademark in the tens of millions of dollars, had used the trademark for approximately twenty-eight years, had promoted the trademark in a variety of media including printed publications, television, radio, the internet, trade fairs, and community events, had used the trademark on a variety of collateral products, and even had conducted two formal brand awareness studies.  The TTAB emphasized that it is the duty of the party "asserting that its mark is famous to *clearly prove it*." (emphasis in original; *Id.* at pp.46-47). Moreover, the TTAB also noted that even if a national

reputation/fame had been shown, then such reputation/fame is insufficient in itself to establish any likelihood of confusion (*Id.* at pp. 47-48).

To the extent Ocinomled or Emeril's contends that its internet presence, a book about its business, advertisements, reviews, and remote customers may influence its trade territory, the Court of Appeals for the Federal Circuit and the TTAB have determined that overlapping advertising and customer solicitation do not warrant a determination that there is a likelihood of confusion.[3] In any event, overlapping advertising is permitted even though it might give rise to possible confusion, since "[T]he Lanham Act does not require the complete elimination of all confusion." *America's Best, supra.*

The TTAB decision errantly states "In a concurrent use proceeding, the fame and extent of reputation of all the **parties** have a bearing on the likelihood of confusion analysis." (p. 42) J.A. 42. (emphasis added.) That pronouncement is wrong: it is of course the fame of the **trademarks** that might have such a bearing. The TTAB then spends an inordinate time focusing on Mr. LaGasse's various personal activities, rather than the activities and the impact of those activities directly involving the relevant one of his companies' several trademarks:

---

[3] *See, e.g., Amalgamated Bank of New York v. Amalgamated Trust & Savings Bank*, 842 F.2d 1270 (Fed. Cir. 1988); *Terrific Promotions, Inc. v. Vanlex, Inc.*, 36 U.S.P.Q.2d 1349 (TTAB 1995) (Mention of concurrent user in in-flight airline magazine and *New York* magazine did not prevent issuance of concurrent use registration.); *CDS, Inc. v. ICED Management, Inc.*, 80 U.S.P.Q.2d 1572 (TTAB 2006); *See also Boi Na, supra.*

"DELMONICO". Further, the TTAB fails to cite to or rely on any evidence as to what the *future* activities of either Ocinomled or Emeril's are expected to be, especially when considering when Mr. LaGasse might have ceased being an alleged celebrity or ceased as a living human.

The most potent evidence regarding what Ocinomled and Emeril's regard as the trade territory in which they hold exclusive rights is their own behavior.

Emeril's in part selected the DELMONICO trademark rather than "EMERIL'S DELMONICO" for its new Las Vegas restaurant because one of Mr. Lagasse's companies was already operating an "EMERIL'S" brand restaurant in the MGM Hotel in Las Vegas, and its lease agreement with the MGM Hotel provided that Mr. Lagasse's companies would not operate or authorize another "EMERIL'S" branded restaurant on the strip in Las Vegas; however, the "Emeril's" brand could be used on a restaurant located outside of the strip. Since the MGM was entitled to receive ten percent of the revenues of the "Emeril's" restaurant, the restriction was agreed upon as defining the effective area where another "EMERIL'S" restaurant would not draw customers away from or be significantly confused with the existing "EMERIL'S" restaurant at the MGM. J.A. 2249-2255. It will be appreciated that the trademark "EMERIL'S" is even more associated with Mr. Lagasse than is DELMONICO and that the existing EMERIL'S restaurant at the MGM Hotel in Las Vegas would likely draw a

considerable number of patrons from outside the Las Vegas area. Thus, the contract evidences what Mr. Lagasse's companies have thought is a reasonable scope of geographic trade territory and protection for their restaurants -- less than a few miles.

Ocinomled has known about another party's use of DELMONICO'S in two mid-town Manhattan delicatessen restaurants for many years, and has not complained about, or taken any action with respect to, that enterprise, despite the fact that Ocinomled has encountered instances of actual confusion between its restaurant operations and that other party's mid-town restaurant operations. Some of the confusion has been in the nature of Ocinomled's receipt of telephone calls requesting take-out orders for food of a type that is not on its own take-out menu, but that is on the menu of the mid-town restaurant operations. J.A. 5272-5274; J.A. 5323-5324; J.A. 5095-5096; J.A. 303-352. Ocinomled lamely contends it cannot live with Southwestern operating anywhere outside the 40 mile radius from the Empire State Building, despite the fact that Ocinomled has acquiesced in another entity's DELMONICO'S restaurant within a couple of miles of its Wall Street restaurant location.

### 4. The TTAB Disobeyed The Statutory Mandate of 15 U.S.C. § 1067

15 U.S.C. § 1067 provides:

In every case of application to register as a lawful concurrent user, the Director shall give notice to all parties and shall direct a Trademark Trial

and Appeal Board to determine and decide the respective rights of registration.

Note this statute does not say determine the rights of an applicant to a particular concurrent use registration. It says "the respective rights of registration", which means each of the parties' rights to registration.

The TTAB ignored this statutory mandate, and left the three parties in limbo over their rights, presumably with each permitted to expand geographically willy-nilly. Moreover, permitting Ocinomled and Emeril's to expand would result in an augmentation, rather than reduction, of any likelihood of confusion in view of the instances of actual confusion between their existing operations. Moreover, as mentioned in the TTAB decision (at p. 34) J.A. 34, both Ocinomled and Emeril's filed applications to register their marks after learning of Southwestern's application. The instant opposition has been litigated for ten years, and the TTAB's (in)decision opens the door for further opposition proceedings. Thus, by failing to comply with the mandate of § 1067, the TTAB has promised a three-party orgy of eternal litigation.

## **CONCLUSION AND STATEMENT OF RELIEF SOUGHT**

Southwestern asks this Court to reverse the TTAB's decision and to grant its concurrent use application.

Dated:  December 10, 2015

Respectfully submitted,


/s/Robert E. Purcell
Robert E. Purcell
   *Counsel of Record*
The Law Office of Robert E. Purcell, PLLC
211 West Jefferson Street, Suite 24
Syracuse, NY 13202
Tel:  315-671-0710

*Counsel for Appellant*
*Southwestern Management, Inc.*

# ADDENDUM – DECISION(S) OF BOARD

> THIS OPINION IS A
> PRECEDENT OF THE TTAB

Mailed: June 11, 2015

## UNITED STATES PATENT AND TRADEMARK OFFICE

————

### Trademark Trial and Appeal Board

————

*Southwestern Management, Inc.*
*v.*
*Ocinomled, Ltd.*
*and*
*Emeril's Food of Love Productions, LLC*

————

Concurrent Use Proceeding No. 94002242

————

Robert E. Purcell of The Law Office of Robert E. Purcell, PLLC for Southwestern Management, Inc.

Dickerson M. Downing of Crowell & Moring LLP for Ocinomled, Ltd.

Lynn S. Fruchter of Cowan, Liebowitz & Latman P.C. for Emeril's Food of Love Productions, LLC.

————

Before Richey, Deputy Chief Administrative Trademark Judge, and Ritchie and Masiello, Administrative Trademark Judges.

Opinion by Masiello, Administrative Trademark Judge:

In this concurrent use proceeding involving restaurant services, we find that the plaintiff/applicant Southwestern Management, Inc. ("Applicant") is not entitled to a restricted concurrent use registration in the form requested because, even in Applicant's current territory, there would be a likelihood of confusion among its mark and the excepted users' essentially identical marks.

Concurrent Use No. 94002242

Applicant applied to register the mark DELMONICO'S, in typed form, for "Restaurant services," in International Class 43.[1] When the application was published for opposition, Ocinomled, Ltd. ("OL") and Emeril's Food of Love Productions, LLC ("EFOL") each filed a notice of opposition against registration of Applicant's mark based on their respective uses of marks including the term DELMONICO'S or DELMONICO.[2] (Each of OL and EFOL are referred to herein as a "Defendant," and together they are the "Defendants.") On December 27, 2006, Applicant filed, in the EFOL opposition, a motion to amend its application to seek a concurrent use registration and for the institution of a concurrent use proceeding. Applicant filed a similar motion in the OL opposition on December 28, 2006. In those motions, Applicant consented to the entry of judgment against itself as to its right to an unrestricted registration. By an order of August 2, 2007, applicable to both oppositions, the Board accepted Applicant's amendment to its application; entered judgment against Applicant as to its right to an unrestricted registration; dismissed the two opposition proceedings; and instituted this concurrent use proceeding.

In the application, as amended, Applicant names Defendants as exceptions to its exclusive right to use the mark in commerce, and Applicant "claims exclusive right to use the mark in the area comprising all of the United States" except the following territories of Defendants:

---

[1] Application Serial No. 78271067, filed July 7, 2003, alleging first use at least as early as May 15, 1998 and first use in commerce at least as early as December 31, 1998.

[2] OL's opposition proceeding was designated No. 91170020; EFOL's opposition proceeding was designated No. 91170155.

Concurrent Use No. 94002242

| | |
|---|---|
| With respect to OL: | a forty mile radius around the Empire State Building in New York; |
| With respect to EFOL: | a forty mile radius around the Superdome in New Orleans, Louisiana, and a forty mile radius around the Stratosphere in Las Vegas, Nevada. |

Both Defendants filed statements under 37 C.F.R. § 2.99(d)(2) denying that Applicant had the right to use its mark in the territory claimed in the application. OL, for its part, also denied that its own rights were limited to the territory ascribed to it in the application. EFOL raised, as "affirmative defenses," the allegation that Applicant did not adopt the mark DELMONICO'S in good faith, and that Applicant "does not own valid rights" in that mark.

I.   <u>The record</u>.

The record includes the file of the involved application and the following testimony and evidence.

A.   <u>Applicant's evidence</u>.

Applicant has made of record the testimony depositions (with exhibits thereto) of the following witnesses:[3]

John William Wade II, Applicant's principal, 139 TTABVUE; 134 TTABVUE (confidential exhibits); 194 TTABVUE (OL's exhibits).

James Edward Monte, Applicant's Director of Operations, 136 and 194 TTABVUE.

Thomas Patrick O'Brien, Applicant's District Manager, 127 and 194 TTABVUE.

---

[3] Applicant also filed a notice of reliance on July 8, 2011, 137 TTABVUE, which was stricken as untimely by Board order of January 19, 2012, 149 TTABVUE.

A3

Concurrent Use No. 94002242

> John William Wade, President of Applicant's operating subsidiaries, 138 and 135 TTABVUE.[4]
>
> John William Wade (rebuttal testimony), 123 TTABVUE and 122, 121 TTABVUE (confidential pages).

B.    <u>OL's evidence</u>.

OL has made of record the testimony depositions (with exhibits thereto) and excerpts of the discovery depositions of the following witnesses:

(1)    <u>Testimony</u>.

> Corrado Goglia, General Manager of OL's Delmonico's restaurant. 179, 181 TTABVUE and 180 (confidential pages).
>
> Dennis Turcinovic, OL's Managing Partner, 182-189 TTABVUE.
>
> Milan Licul, OL Partner, 190-193 TTABVUE.

(2)    <u>Discovery depositions</u>.[5]

> Anthony Cruz, Chief Financial Officer of Emeril's Homebase (excerpts); Exhibit L, 73 TTABVUE 126-185.
>
> Emeril Lagasse, EFOL's principal (excerpts); Exhibit M, 73 TTABVUE 186-250.
>
> John W. Wade, President of Applicant's operating subsidiaries (as Rule 30(b)(6) representative of Applicant) (excerpts); Exhibit N, 73 TTABVUE 251-74 TTABVUE 101.

(3)    <u>Other evidence filed under notice of reliance</u>.

> Applicant's responses to interrogatories of OL, Exhibits A, B, C, 73 TTABVUE 12-50.

---

[4] We will cite the various depositions of the two Messrs. Wade as "Wade II" in the case of Applicant's principal and "Wade, Sr." or "Wade, Sr. rebuttal" in the case of the president of the operating subsidiaries.

[5] Filed under OL's notice of reliance, 73-74 TTABVUE.

Concurrent Use No. 94002242

> Applicant's responses to interrogatories of EFOL, Exhibits D and E, 73 TTABVUE 51-81.
>
> EFOL's responses to interrogatories of OL, Exhibits F, G and H, 73 TTABVUE 82-104.
>
> EFOL's responses to interrogatories of Applicant, Exhibits I, J, and K, 73 TTABVUE 105-125.
>
> Proclamation of "Delmonico's Day" by Mayor Rudolph Giuliani, Exhibit O, 74 TTABVUE 102-103.
>
> New York State service mark registration of design mark of OL, Exhibit O, 74 TTABVUE 104.
>
> Published news articles, Exhibit P, 74 TTABVUE 105-143.

C.    EFOL's evidence.

EFOL has made of record the testimony depositions (with exhibits thereto) and excerpts of the discovery depositions of the following witnesses:

(1)    Testimony.

> Anthony Cruz, Chief Financial Officer, Emeril's Homebase LLC, 118-120 TTABVUE.
>
> Adam Moran, Vice President of Operations, All Seasonings, 108-109 TTABVUE.
>
> Jay Falcon, product manager, American Express, 116-117 TTABVUE.

(2)    Discovery depositions.

> Emeril Lagasse (excerpts), EFOL's first notice of reliance, 93 TTABVUE.[6]
>
> John W. Wade, II, Applicant's principal, EFOL's third notice of reliance, 87 TTABVUE.

---

[6] EFOL submitted excerpts of the discovery deposition of its own principal under 37 C.F.R. § 2.120(j)(4); neither of the other parties has objected.

Concurrent Use No. 94002242

John W. Wade, President of Applicant's operating subsidiaries (as Rule 30(b)(6) representative of Applicant) (excerpts); EFOL's second notice of reliance, 86 TTABVUE.

Milan Licul, OL's President, EFOL's fourth notice of reliance, 90 TTABVUE (redacted) and 100 TTABVUE (complete).

Corrado Goglia, General Manager of OL's Delmonico's restaurant, EFOL's fifth notice of reliance, 88 TTABVUE.

Dennis Turcinovic, OL's Managing Partner, EFOL's sixth notice of reliance, 91 TTABVUE.

Judith Choate, food writer and consultant (excerpts), 84 TTABVUE.[7]

(3)    <u>Other evidence filed under notice of reliance</u>.

OL's responses to interrogatories and requests for admission of EFOL; EFOL's seventh notice of reliance, Exhibits A-C, 98 TTABVUE 5-162 (redacted at # 92).

Applicant's responses to interrogatories of EFOL; EFOL's seventh notice of reliance, Exhibit D, 98 TTABVUE 163-177 (redacted at # 92).

EFOL's U.S. service mark application No. 77012660; OL's U.S. service mark application No. 76577253; EFOL's eighth notice of reliance, Exhibits A and B, 89 TTABVUE 4-26.

Louisiana trade name registration certificate; Application for same; certificate of recordation of trade name; assignment of trade name; EFOL's eighth notice of reliance, Exhibit C, 89 TTABVUE 27-31.

Press notices, EFOL's ninth notice of reliance, Exhibits A, B, C, D, and E, 95 TTABVUE 11-96 TTABVUE 242.

List of telephone area codes, EFOL's ninth notice of reliance, Exhibit F, 96 TTABVUE 243-256.

Excerpts from published travel guides, EFOL's ninth notice of reliance, Exhibit G, 96 TTABVUE 257-270.

---

[7] The parties stipulated to allow excerpts of this discovery deposition of a non-party to be entered into evidence, under 37 C.F.R. § 2.120(j)(2). 83 TTABVUE.

Concurrent Use No. 94002242

II.     Evidentiary objections.

We first consider two sets of evidentiary objections filed by Applicant. The first is "Applicant's First Statement of Objections" filed on July 7, 2011 (129 TTTABVUE). The second is a motion for exclusion of certain evidence of EFOL as a sanction for discovery abuse. 133 TTABVUE (motion) and 132 TTABVUE (supporting affidavit).

A.     First Statement of Objections.

EFOL included its response to Applicant's First Statement of Objections in its brief on the case (196 TTABVUE 51-55). OL did not respond to Applicant's objections.

We address first Applicant's objections to OL's evidence. We exclude from consideration the Proclamation of Delmonico's Day of Mayor Rudolph Giuliani.[8] The document was found on the wall of OL's restaurant at the time OL purchased the business. Licul 15:13-19, 190 TTABVUE 12. This document is not an official record suitable for submission under a notice of reliance, *see* Trademark Rule 2.122(e), 37 C.F.R. § 2.122(e); and Mr. Licul could not authenticate it.

We exclude the Continental Airlines menu, Licul Exhibit 62, 202 TTABVUE 37-39, as it was requested during discovery but not produced prior to its introduction at trial. Fed. R. Civ. P. 37(c). OL's counsel stated that he had just received the document on the morning of Mr. Licul's testimony, and offered to withdraw it. Licul 85:14-15, 190 TTABVUE 75. For the same reason we exclude Licul Exhibits 50 and

---

[8] Submitted as Exhibit O to OL's notice of reliance, 74 TTABVUE 102-103, and as Exhibit 47 under the testimony of Milan Licul, 192 TTABVUE 8.

Concurrent Use No. 94002242

52, 192 TTABVUE 12-14, 17-19, although they are merely print versions of online news articles already in the record.

We exclude as hearsay the statement "he told me they opened the restaurant sometime the first week of May." Licul 33:13-14, 190 TTABVUE 30.

Applicant's other objections to OL's evidence consist primarily of criticism of foundation or the personal knowledge of the witness, criticisms that go primarily to the probative weight of the evidence. The Board is able to weigh such evidence and testimony appropriately, and we see no need to exclude it outright. The certificate of occupancy, Licul Ex. 56, 192 TTABVUE 28-29, is admitted for what it shows on its face, as Mr. Licul adequately explained its provenance. News articles from publications of general circulation (Licul Exhibits 48-54, 192 TTABVUE 9-26) are admissible without authentication for what they show on their face. 37 C.F.R. § 2.122(e).

We next address Applicant's objections to EFOL's evidence and testimony. We find unpersuasive Applicant's criticisms of the testimony of Anthony Cruz as lacking in foundation and personal knowledge. As the chief financial officer, Mr. Cruz was well-positioned to know or have access to information relevant to the substance of his testimony and the documents that he identified. While not all portions of Mr. Cruz's extensive testimony are of equal probative weight, the Board is able to appropriately weigh it, and we see no need to exclude outright the testimony to which Applicant objects. We find EFOL's summary of restaurant revenues (Cruz Ex. 66, 120 TTABVUE 66-67) admissible under Fed. R. Evid. 1006;

A8

Concurrent Use No. 94002242

and we find that Mr. Cruz was an appropriate witness to authenticate it. Reservation records of EFOL, Cruz Exhibits 89-94, 120 TTABVUE 142-193, are admissible as business records and summaries thereof.

The American Express transaction reports for EFOL's restaurants, Falcon Exhibits 99-102, 116 TTABVUE 66-100, 117 TTABVUE 3-128, are admissible as business records of American Express, and Jay Falcon was an appropriate witness to authenticate them. Fed. R. Evid. 803(6).

For purposes of identifying the geographic location of its customers, EFOL submitted under notice of reliance a listing of telephone area codes.[9] The information was published online by the North American Numbering Plan Administration ("NANPA"), a private organization that operates a telephone numbering plan in which the United States and many other countries of North America participate. We find it admissible under notice of reliance as a publication of general circulation under 37 CFR § 2.122(e) and *Safer, Inc. v. OMS Investments, Inc.*, 94 USPQ2d 1031 (TTAB 2010); and we find, as suggested by EFOL, that it is within the residual exception of the hearsay rule, Fed. R. Evid. 807. As required by that rule, it has "circumstantial guarantees of trustworthiness" analogous to those of a public record: NANPA cooperates with the regulatory agencies of many nations and has a reputational interest in publishing an accurate account of its numbering system and no motive to make false entries or omit proper ones.[10] The list "is offered

---

[9] EFOL's 9th notice of reliance, Ex. F, 96 TTABVUE 243-256.

[10] By analogy, the justification for the hearsay exception for public records "is the assumption that a public official will perform his duty properly and the unlikelihood that he

9

Concurrent Use No. 94002242

as evidence of a material fact," *i.e.*, the geographic location of actual customers of EFOL; on this point, the evidence is a highly efficient way of identifying the states of residence of customers whose actual addresses are not in-hand, and as such it is "more probative … than any other evidence that [EFOL] can obtain through reasonable efforts." Admitting the evidence will serve the interests of justice and the purposes of the Rules of Evidence by allowing the Board to perform the geographical analysis required by this proceeding on the basis of meaningful and objective evidence. Finally, the other parties had notice of EFOL's intention to rely upon this evidence as of November 3, 2010, more than four months prior to the first testimony depositions taken in this case, giving them ample opportunity to meet the evidence. We note, moreover, that the list of area codes is capable of being checked for accuracy by the other parties, neither of which has sought to demonstrate that any of the information in it is incorrect.

B    <u>Applicant's motion to preclude evidence as a sanction for discovery abuse</u>.

Applicant moves the Board to preclude all evidence relating to use "by any person or entity" of the designation BAM;[11] and to preclude Cruz Exhibits 25, 26 and 31,

---

will remember details independently of the record." Notes of Advisory Committee on Proposed Rules, Rule 803, exception (8). Here, too, there is no witness who would be capable of testifying as to this lengthy list of numbers without relying on the list itself. Moreover, the evidence is objective, not subjective, in nature, as it does not reflect "matters observed" or an "evaluative report" of any person. *See id*.

[11] As discussed *infra*, BAM is a term associated with Defendant EFOL and its principal, Emeril Lagasse.

10

A10

Concurrent Use No. 94002242

119 TTABVUE 151-156, 157-158, 179-184,[12] all as a sanction for EFOL's improper discovery practices. See Fed. R. Civ. P. 37(c)(1).[13] The motion is fully briefed as between Applicant and EFOL.

(1)  <u>Evidence relating to BAM</u>.

Applicant contends that EFOL withheld production of documents relating to the designation BAM as well as Exhibits 25, 26, and 31 until "long after the documents were requested and after discovery depositions had concluded, and sometimes after the discovery cut-off date."[14] In document requests served on September 10, 2007, Applicant called for:

> All documents referring or relating to, or evidencing any facts, circumstances, or admissions that Concurrent Users believe support any contention that Applicant is not entitled to a federal concurrent use registration based upon the concurrent use application at issue in these proceedings, including, but not limited to, a registration limited by the geographic boundaries set forth in such application.[15]

EFOL responded to the request as follows:

> Emeril's objects to this request on the ground that it is overbroad and unduly burdensome. Emeril's further objects on the ground that it is improper under the Board's precedents. [Citations omitted.] Emeril's contends

---

[12] Ex. 25 is a real estate purchase contract for the premises of EFOL's New Orleans restaurant; Ex. 26 is an addendum to that agreement; and Ex. 31 is a memorandum of Eric Lindquist, CEO of Emeril's Homebase, LLC.

[13] "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. ..."

[14] Applicant's motion brief at 2, 133 TTABVUE 3.

[15] Request no. 31, Applicant's first request for production; *see* Declaration of Robert E. Purcell, Ex. A, 132 TTABVUE 6-11.

A11

Concurrent Use No. 94002242

> that upon information and belief, Applicant did not adopt
> the mark DELMONICO'S in good faith, Applicant does
> not own valid rights in the mark DELMONICO'S for
> restaurant services, and Applicant is not entitled to
> exclusive rights to the mark DELMONICO'S in the
> geographic areas set forth in its amended Application.[16]

Applicant contends that any documents relating to use of the designation BAM by
EFOL, Applicant, and third parties would have been responsive to its Request no.
31 and that, indeed, the request did call for them. On February 26, 2009, EFOL
"served over 1000 pages of documents bearing Bates Numbers 03071 through 04265
upon [Applicant]," many of which related to the BAM designation. Such service
occurred "over one month after [Emeril] Lagasse's [discovery] deposition" had
occurred.[17] Applicant argues that the late timing of production of these documents
was "deliberate," and that Applicant was thereby deprived of the opportunity to
address the late-produced documents during Mr. Lagasse's deposition.[18]

  EFOL responds that Applicant's Request no. 31 was a "broadly worded catch-all"
and "a hopelessly overbroad document request that basically sought all of Emeril's
supporting evidence on every undefined issue in the case"; that EFOL's objection to
it was warranted; and that Applicant never moved to compel a further response to
Request no. 31.[19] EFOL contends that the purportedly "late" production of the BAM
documents is explained by the fact that on January 16, 2009, a week before the
scheduled discovery depositions of EFOL's personnel (including Mr. Lagasse),

---

[16] Purcell Declaration, Ex. B, 132 TTABVUE 18-30.

[17] Applicant's motion brief at 4, 133 TTABVUE 5.

[18] *Id.* at 5-6, 133 TTABVUE 6-7.

[19] EFOL's brief in response to motion at 3-5, 140 TTABVUE 4-6.

Concurrent Use No. 94002242

Applicant served "a detailed set of 27 requests addressing the 'BAM' topic." EFOL states that it "served timely responses" to those requests on February 19, 2009.[20] EFOL points out that Applicant and its counsel knew that responses to these requests were not due until after the planned depositions; yet Applicant did not seek to reschedule the depositions; nor did it seek to take further depositions of EFOL after Applicant received EFOL's responses, even though the discovery period remained open for almost four more months, through June 5, 2009.[21] EFOL argues that Applicant's "inability to use the 'BAM' documents at depositions was entirely the result of its own litigation strategy."[22]

We agree that Applicant's Request no. 31, by its general and nonspecific nature, called upon EFOL to disclose in advance of trial the entirety of its proposed evidence in support of its case and, as such, it was an unduly burdensome request. We find that EFOL's objection to the request was substantially justified within the meaning of Fed. R. Civ. P. 37(c)(1). *Time Warner Entertainment Co. v. Jones*, 65 USPQ2d 1650, 1656 (TTAB 2002); *British Seagull Ltd. v. Brunswick Corp.*, 28 USPQ2d 1197, 1201 (TTAB 1993), *aff'd, Brunswick Corp. v. British Seagull Ltd.*, 35 F.3d 1527, 32 USPQ2d 1120 (Fed. Cir. 1994). The circumstances under which Applicant obtained the BAM documents do not warrant a sanction against EFOL.

---

[20] Declaration of Deborah K. Squiers, ¶¶ 4-5, 140 TTABVUE 13-15; Purcell Declaration, Ex. C, 132 TTABVUE 31-42.

[21] Squiers Declaration ¶6, 140 TTABVUE 13-15; EFOL's brief in response to motion at 5, 140 TTABVUE 6.

[22] EFOL's brief in response to motion at 5, 140 TTABVUE 6.

A13

Concurrent Use No. 94002242

(2)    <u>Exhibits 25 and 26</u>.

The discovery period in this case closed on June 5, 2009. On July 29, 2009, EFOL first produced the documents that would ultimately be used as Cruz Exhibits 25 and 26, a November 1996 real estate purchase agreement and a February 1997 addendum to it. They appear to be precursors to the ultimate purchase of the real estate which, according to Applicant's brief, occurred on March 3, 1997.[23] Applicant argues that EFOL "cannot legitimately deny that it had possession, custody, or control of the documents comprising Exhibits 25 and 26," and that EFOL has no valid excuse for the late production.

EFOL contends that the documents at issue were not in the files of EFOL or its attorneys; and that EFOL ultimately obtained them from an attorney for the bank that financed the purchase transaction, whereupon EFOL promptly produced them. EFOL points out that this is the second time that Applicant has moved to strike these documents for the same reasons now urged by Applicant, and that the Board earlier denied the motion and characterized EFOL's production of the documents as a timely supplementing of its document production.[24] That decision of the Board was based upon an extensive evidentiary record, including declarations of Anthony Cruz and an attorney for EFOL named Mark Stein, which supported EFOL's account of the relevant events.[25]

---

[23] Applicant's motion brief at 7, 133 TTABVUE 8.

[24] Board order of January 14, 2010, 70 TTABVUE 5.

[25] 56 TTABVUE 11-26 and 41-43.

14

A14

Concurrent Use No. 94002242

In view of the Board's previous decision on this point, we remain unpersuaded that Exhibits 25 and 26 should be excluded.

(3)    Exhibit 31.

Cruz Exhibit 31 is a memorandum of Eric Lindquist, CEO of Emeril's Homebase, LLC, which EFOL "did not produce until June 29, 2010, after the discovery cut-off and less than four months before [EFOL's] trial testimony depositions."

Mr. Lindquist did not testify in this proceeding, and Applicant contends that Mr. Cruz was incapable of laying a foundation for the document or of authenticating it. Applicant points out that the document long predates the discovery phase of this proceeding, and argues that "[a]s a result of [EFOL's] failure to produce this document on a timely basis, [Applicant] was never able to ask any of [EFOL's] witnesses about it at their discovery depositions. This undeniably prejudiced Southwestern…."[26]

EFOL contends that it produced Ex. 31 promptly after it was discovered, as a supplement to its earlier discovery production. Mr. Cruz testified knowledgeably about the provenance of the document, including the manner in which it belatedly came to light after being overlooked in earlier searches for discoverable matter. EFOL contends that Applicant has waived any objection to the authentication of the document, as the objection was not made at trial (during Mr. Cruz's testimonial deposition) when the alleged defect could be cured. We agree. *Hornby v. TJX Cos. Inc.*, 87 USPQ2d 1411, 1416 (TTAB 2008). In any event, we find Mr. Cruz's

---

[26] Applicant's motion brief at 9-10, 133 TTABVUE 10-11.

Concurrent Use No. 94002242

familiarity with the document and its origin and his experience in using it as a "game plan" for EFOL's business operations sufficient to qualify him to authenticate it. We also agree with EFOL that it is within the business records exception to the hearsay rule; however, by its nature there appears to be little need to read it for the truth of the matter asserted.

In sum, we deny Applicant's motion to preclude evidence relating to the designation BAM and Cruz Exhibits 25, 26, and 31.

III.    <u>The parties</u>.

A.    <u>Applicant</u>.

Applicant operates, through its affiliated corporations, five restaurants located in Syracuse, Albany, Utica, and Rochester (all in the state of New York); and Orlando, Florida. The restaurants specialize in "Italian food and steak," offered at moderate prices. A featured and popular menu item is a 24 oz. "Choice Center Cut Rib-eye Steak" called "Delmonico's Delmonico Steak."[27] In 2010, this steak was offered for $15.99. Other entrees on the same menu range in price between $8.99 (pasta with marinara sauce) to $19.99 (filet mignon and New York strip sirloin).[28] Most of Applicant's signage refers to the restaurants as "Delmonico's Italian Steakhouse"; but Applicant's menus make prominent use of the designation DELMONICO'S alone, and Applicant makes regular, incidental use of DELMONICO'S alone. The restaurants are casual in ambiance. The restaurants' interior walls, the menus, and

---

[27] *See* menu at Wade II, Ex. 4, 139 TTABVUE 185-6; *see also* Wade, Sr. discovery dep. 245:4-8, OL's notice of reliance, Ex. N, 74 TTABVUE 23.

[28] Wade II, Ex. 4, 139 TTABVUE 186.

Concurrent Use No. 94002242

Applicant's website are decorated with caricatures, some depicting celebrities such as Frank Sinatra, Dean Martin, and Luciano Pavarotti.[29] Background music is "Muzak, 40's and 50's Sinatra, Tony Bennett, Dean Martin, Italian singers, Jerry Vale."[30] Servers "wear red mock turtlenecks and black pants or black skirts, and the hostesses wear a black skirt and a black vest and a white blouse, and … a fedora type hat."[31] Applicant's first restaurant, in Syracuse, opened to the public on May 16, 1998; and the previous day approximately 400 invited guests were served without charge. The restaurant opened without advance publicity.[32] The restaurants in Albany, Utica, and Rochester opened in 2000, 2003 and 2005, respectively.[33] Construction of the restaurant in Orlando was nearing completion at the time of trial, and an opening was projected for April 4, 2011.[34]

B.    <u>OL</u>.

OL operates a restaurant under the mark DELMONICO'S at 56 Beaver Street in downtown Manhattan in a building that, for much of the twentieth century, housed a restaurant called "Delmonico's," the lore of which dates back even further. (The historic Delmonico's restaurant, according to lore, commenced business in the 1820s. It was not always located at 56 Beaver Street.) Importantly, OL does not claim to own the goodwill of the historic Delmonico's restaurant. That restaurant

---

[29] *Id.*, 139 TTABVUE 185.

[30] Wade, Sr. 23:22-25, 138 TTABVUE 29.

[31] *Id.*, 22:22-23:17, 138 TTABVUE 28-29.

[32] Wade II, 14:14-24, 15:18-24, 16:5-8, 139 TTABVUE 21-23.

[33] Wade, Sr. 22:5-13, 138 TTABVUE 28.

[34] Wade, Sr., rebuttal, 53:25-54:5, 122 TTABVUE 53-4.

Concurrent Use No. 94002242

closed, likely as early as 1990.[35] In mid-1998 a company called CIBE Beaver, LLC opened a restaurant under the mark DELMONICO'S in the premises previously occupied by the historic restaurant.[36] OL purchased the restaurant from CIBE Beaver, LLC in 1999, closed it for refurbishment for a few weeks, and then recommenced business under the mark DELMONICO'S.[37] OL has stated, "Ocinomled limits its claims to the right to use the DELMONICO'S Mark to any rights it may have acquired through CIBE Beaver, LLC and any rights Ocinomled developed through its own use of the DELMONICO'S Mark ...."[38]

In operating and promoting its restaurant, OL liberally invokes a cultural connection to the historic Delmonico's restaurant. For example, OL's menu carries a number of items that, according to lore, had their origins in the historic Delmonico's, such as Lobster Newburg, Oysters Rockefeller, Baked Alaska, Eggs Benedict, Chicken à la Keene,[39] and Delmonico Steak.[40] It is a high-priced restaurant with a "classic and upscale" ambiance.[41] A 2010 menu offers "Delmonico Steak," a boneless rib eye cut, for $44.00. Other entrees range in price between $28.00 (chicken à la Keene) and $90.00 (Double Porterhouse steak and Delmonico

---

[35] *See* "Off the Menu," The New York Times, Wednesday, May 13, 1998, p. F9, OL's notice of reliance, Ex. P, 74 TTABVUE 107-109.

[36] *Id.*; Turcinovic 7:9, 182 TTABVUE 10.

[37] Turcinovic 7:3-20, 182 TTABVUE 10.

[38] OL's response to Interrogatory no. 1 of EFOL's second set of interrogatories; see EFOL's seventh notice of reliance, Exhibit B, 98 TTABVUE 21-23.

[39] A dish that found its way into high school cafeterias under the name "Chicken à la King," probably with alterations to more than its name. *See* 181 TTABVUE 7.

[40] Goglia Ex. 2, 181 TTABVUE 6-10 (menu).

[41] OL's brief at 12, 178 TTABVUE 19; Turcinovic 13:10-12, 182 TTABVUE 16.

Concurrent Use No. 94002242

Double Rib Chop).[42] In the press, OL's restaurant is often associated with a clientele

consisting of Wall Street financial district workers with expense accounts.[43]

C.    EFOL.

   EFOL and its associated corporations operate a number of restaurants under the

direction of their principal, Emeril Lagasse. Two of EFOL's restaurants operate

under the mark DELMONICO. One of them, located in New Orleans, LA, is most

often promoted as EMERIL'S DELMONICO but is also marked by an outdoor sign

saying DELMONICO;[44] the other, located in Las Vegas, NV, is called DELMONICO

STEAKHOUSE.[45] The New Orleans restaurant occupies premises that have long

housed a restaurant called DELMONICO. According to lore, the restaurant was

first established under that name by Anthony Commander in 1895 (supposedly with

the consent of the historic Delmonico in New York City); and Mr. Commander sold

the business in 1911 to Anthony LaFranca, whose family continued to own and

operate the business, both directly and through ownership of various corporate

vehicles. In 1997, the day before *Mardi Gras*, the restaurant closed. On March 3,

1997, Emeril, LLC purchased the business from Delmonico Restaurant, Inc., Angela

---

[42] Goglia Ex. 2, 181 TTABVUE 6-10.

[43] *See, e.g.*, "In a Steak Palace, a Timely Turn to Pasta," The New York Times, October 14, 1998, p. F9; "The 5 Stages of Wall Street Grief," The New York Post, October 26, 2008 (online); "Wall Street Drowns its Sorrows," Financial Times, November 29, 2008, p. 21; 74 TTABVUE 113-115; 118-122; 123-126.

[44] Lagasse discovery dep. 52:22-53:3, 93 TTABVUE 51-52.

[45] *See* Cruz Exhibits 62, 63 (press kits for the two restaurants, showing use of DELMONICO alone), 119 TTABVUE 280-120 TTABVUE 9.

Concurrent Use No. 94002242

LaFranca Brown and Rose Marie LaFranca Dietrich[46] (who had been operating it), and undertook extensive renovations to the building lasting more than a year. After some "soft openings" for invited guests at the end of May, 1998, the restaurant reopened to the public on June 1, 1998.[47] Emeril, LLC assigned the mark DELMONICO to EFOL effective December 9, 1999.[48] DELMONICO STEAKHOUSE opened in Las Vegas in May, 1999.[49]

EFOL's New Orleans restaurant serves food described as "Classic New Orleans Creole with Modern Influences." A menu from approximately 2008 lists a "20 oz. In-House Dry Aged Bone-In Ribeye" steak at $38.00 and an "8 oz. Filet" and a "12 oz. In-House Dry Aged New York Strip," each at $39.00. Other entrees start at $27.00.[50] EFOL's Las Vegas restaurant describes its cuisine as "A Classic American Steakhouse with Creole influences." A menu from approximately 2005 lists a "Ribeye Steak" at $36.00, and a "Bone In Rib Steak" at $44.00. Other entrees range in price from $27.00 (shrimp Scampi with linguine) to $80.00 (Chateaubriand, for two).[51] Both restaurants boast award-winning wine lists.

---

[46] EFOL's response to Interrogatory no. 11 of OL, OL's notice of reliance Ex. G, 73 TTABVUE 94-95; Cruz 66:20-22 and Ex. 27 (deed of "cash sale"), 118 TTABVUE 73, 119 TTABVUE 159-165.

[47] Cruz 94:16-19, 118 TTABVUE 101.

[48] Cruz 112:8-13 and Ex. 48 ("Confirmatory Trademark Assignment"), 118 TTABVUE 119, 119 TTABVUE 223-224.

[49] Cruz 107:7-13, 118 TTABVUE 114.

[50] Cruz Ex. 62 (press kit for New Orleans restaurant), 119 TTABVUE 280-296.

[51] Cruz Ex. 63 (press kit for Las Vegas restaurant), 119 TTABVUE 297-120 TTABVUE 9.

Concurrent Use No. 94002242

IV.    <u>Priority among the parties</u>.

Applicant contends that, as among the parties, it is the "first, senior user of the trademark … in connection with restaurant services…."[52] This asserted seniority is, in part, the basis for Applicant's claim to the lion's share of the United States as its territory. EFOL and OL vigorously dispute Applicant's claim of seniority. As we explain below, the record does not support a finding that Applicant is the senior user.

A.    <u>Applicant</u>.

Applicant's witnesses are unanimous in testifying that Applicant's first restaurant, in Syracuse, NY, opened to the public on May 16, 1998, with a "dry run" for "friends and family" the previous day.[53] There is no evidence to suggest that Applicant's common law rights arose at any earlier date: the Syracuse restaurant opened without prior publicity. Wade II 16:5-8, 139 TTABVUE 23. Mr. Wade II testified that this became typical procedure: "We typically like to open without advertising so that we can work out any issues we might have with the operation, so we usually hold off on any advertising until after we open." *Id.*

B.    <u>OL</u>.

OL's earliest claimed date of use was nearly contemporaneous with that of Applicant. Two witnesses testified that OL's predecessor commenced doing business

---

[52] Applicant's brief at 14, 130 TTABVUE 19.

[53] Wade II, 14:14-24;  17:12, 139 TTABVUE 21, 24; Monte 12:18;  13:23-14:13, 136 TTABVUE 18-20; O'Brien 14:16-21, 127 TTABVUE 20; Wade, Sr. 13:2;   13:19-23, 138 TTABVUE 19.

Concurrent Use No. 94002242

in May 1998.[54] However, one witness admitted that he had never dined in or entered the restaurant in May of 1998, and another admitted that his information came from second-hand sources.[55] The record includes a certificate of occupancy issued to OL's predecessor, dated March 31, 1998.[56] The opening of the restaurant was reported in the press. The New York Times of May 13, 1998 stated, "The latest version of the restaurant opened on Monday in the landmark building at 56 Beaver Street…"[57] An issue of Time Out New York dated "May 7-14, 1998" states, "When the Italian owners of Bice reopen the eatery's landmarked Beaver Street location on Monday, you'll find …"[58] However, the record's earliest actual review by a critic claiming to have eaten in the restaurant is dated June 5, 1998.[59] This is sufficient evidence on which to make a finding of priority. The fact that OL's predecessor's operation was reported in the press on May 13, 1998, two days prior to Applicant's first use of its mark, demonstrates by a slim preponderance OL's priority. However, in this case the question of OL's priority is of secondary importance, because the more significant priority contest is between Applicant and EFOL.

C.    EFOL.

Applicant has challenged the ability of EFOL's witnesses to provide first-hand testimony as to the early uses of the mark DELMONICO by EFOL's predecessor in

---

[54] Turcinovic 7:9, 182 TTABVUE 10; Licul 14:6-8, 190 TTABVUE 11.

[55] Turcinovic 163:13-25, 182 TTABVUE 166, Licul 34:22-35:3, 190 TTABVUE 31-32.

[56] Licul 43:8-25 and Ex. 56, 190 TTABVUE 40 and 192 TTABVUE 28-29.

[57] Licul Ex. 49, 192 TTABVUE 10-11.

[58] Licul Ex. 48, 192 TTABVUE 9.

[59] Licul Ex. Ex. 51, 192 TTABVUE 15-16.

Concurrent Use No. 94002242

interest. However, there is substantial first-hand testimony and other evidence relating to operations of the LaFranca sisters' DELMONICO restaurant as of dates that are earlier than Applicant's date of first use. Mr. Lagasse testified that he first heard of the restaurant in 1982, after moving to New Orleans.[60] He testified that he dined there a few times in the 1980s, when he was the chef and general manager of Commander's Palace, another New Orleans restaurant. He also testified that the LaFranca sisters approached him in 1995 to propose selling their business to him.[61] The 1996 first edition of *Halliday's New Orleans Food Explorer* listed the LaFranca sisters' DELMONICO restaurant at pp. 7-8.[62] An article of The Atlanta Constitution dated September 21, 1996 takes note of the restaurant as a going concern.[63] Mr. Cruz testified that he was first aware of the LaFranca sisters' DELMONICO restaurant by the "[l]ate '80s, early '90s," and that he dined there several times between February and November, 1996.[64] Mr. Cruz testified at some length regarding his involvement in 1996 in the decision to purchase the LaFranca sisters' business, his familiarity with the status of the restaurant in the New Orleans marketplace, and his belief that it was in operation under the LaFranca sisters until February 10, 1997.[65]

---

[60] Lagasse discovery dep. 7:21, 8:10, OL's notice of reliance, Ex. M, 73 TTABVUE 189, 190.

[61] Lagasse discovery dep. 6:18-7:18; 12:25-13:15, EFOL's first notice of reliance, 93 TTABVUE 12, 18-19.

[62] EFOL's ninth notice of reliance, Ex. G, 96 TTABVUE 258-261.

[63] *Id*., Ex. B, 95 TTABVUE 12-13.

[64] Cruz 369:7, 369:20-370:5, 119 TTABVUE 77.

[65] *Id*. 52-65, 118 TTABVUE 59-72.

Concurrent Use No. 94002242

Emeril, LLC's acquisition of the LaFranca sisters' business is well supported by documentary evidence and testimony of record.[66] The acquisition, which closed on March 3, 1997, clearly included the trademark and trade name DELMONICO, as shown by a separate document of the same date entitled "Sale and Assignment of Movables and Trade Name."[67] On the same date, the sellers undertook to apply for Louisiana registration of the trade name DELMONICO and executed papers to record the assignment of that trade name to Emeril, LLC.[68]

In December, 1999, Emeril, LLC and its related companies transferred their trademarks to EFOL as a matter of organizational restructuring and "clean-up work."[69] That these transfers were undertaken without a writing is not surprising in view of the closely-held nature of the entities involved. Mr. Lagasse wholly owns EFOL as well as the top-level managing entity Emeril's Homebase. Emeril's Homebase, in turn, owns the entities that own and operate the restaurants, including Emeril, LLC, which owns and operates the Delmonico Restaurant in New Orleans, and Delmonico Steakhouse LLC, which owns and operates the Delmonico Steakhouse restaurant in Las Vegas.[70] The transfer of the DELMONICO mark to

---

[66] *See, e.g.*, Cruz Ex. 25 (purchase agreement dated November 5, 1996); Ex. 26 (addendum to the purchase agreement, dated January 22, 1997); Ex. 27 (deed of cash sale of property), 119 TTABVUE 151-165.

[67] Cruz Ex. 28, 119 TTABVUE 166-172.

[68] Cruz Exhibits 29 and 30, 119 TTABVUE 173-178.

[69] Cruz 111-113, 118 TTABVUE 118-120.

[70] Cruz 50:20-51:15; 7:15-22, 118 TTABVUE 57-58, 14.

Concurrent Use No. 94002242

EFOL was ultimately memorialized in a "Confirmatory Trademark Assignment" dated December 20, 2007.[71]

Applicant has sought to cast doubt on the reliability of the transaction documents put forward by EFOL. However, we see no defects in such transactions substantial enough to cause us to doubt the effectiveness of the sale to Emeril, LLC of the LaFranca sisters' business, together with the mark and name DELMONICO, and the assignment of the trademark to EFOL.

Even though there is much evidence, in the nature of press notices, indicating that the LaFranca sisters' business was in operation for a very long time, with respect to the important point of priority we do not read such notices for the truth of the matter asserted. In any event, probative evidence shows that the LaFranca sisters' business was in operation at least as early as 1996 under the mark DELMONICO. Thus, the record shows that EFOL is clearly senior to both OL and Applicant.

V.    Discussion.

Concurrent use proceedings are governed by the following proviso of Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d):

> [I]f the Director determines that confusion, mistake, or deception is not likely to result from the continued use by more than one person of the same or similar marks under conditions and limitations as to the mode or place of use of the marks or the goods on or in connection with which such marks are used, concurrent registrations may be issued to such persons when they have become entitled to use such marks as a result of the concurrent lawful use in

---

[71] Cruz Ex. 48, 119 TTABVUE 223-224.

Concurrent Use No. 94002242

> commerce prior to (1) the earliest of the filing dates of the
> applications pending or of any registration issued under
> this chapter . . . .

There are two "conditions precedent to the issuance of concurrent registrations," specifically: (1) that the party seeking registration be entitled to use the mark in commerce, notwithstanding concurrent use by others; and (2) that there be no likelihood of confusion, mistake or deception in the marketplace as to the source of the relevant goods or services resulting from the continued concurrent use of the trademark. *In re Beatrice Foods Co.*, 429 F.2d 466, 166 USPQ 431, 435-36 (CCPA 1970).

The applicant in a concurrent use proceeding has the burden of proof to demonstrate its entitlement to a concurrent use registration. Trademark Rule § 2.99(e), 37 C.F.R. § 2.99(e); *Over the Rainbow, Ltd. v. Over the Rainbow, Inc.*, 227 USPQ 879, 883 (TTAB 1985); *Gray v. Daffy Dan's Bargaintown*, 823 F.2d 522, 3 USPQ2d 1306, 1308 (Fed. Cir. 1987) (stating that concurrent use plaintiff "was not 'entitled' to [a concurrent use] registration unless he also satisfied the 'touchstone' requirement of no likelihood of confusion with [the defendant's] use"). The respective rights of the parties to registration are determined on the basis of the facts as they exist up to and until the close of the testimony period. *Nark, Inc. v. Noah's, Inc.*, 212 USPQ 934, 944 (TTAB 1981).

26

A26

Concurrent Use No. 94002242

A.    <u>Entitlement to use the mark</u>.

In order to meet the first "condition precedent" to obtaining a concurrent use registration,[72] Applicant must demonstrate that it is "entitled to use [its] mark as a result of … lawful use in commerce prior to (1) the earliest of the filing dates of the applications pending or of any registration issued …." The Board interprets this statutory wording to refer to the filing dates of applications and registrations "involved in the proceeding." Trademark Trial and Appeal Board Manual of Procedure ("TBMP") § 1103.01 (2014). Although both of the Defendants have pending applications, none of them is involved in this proceeding.[73] Applicant's application is the only involved application, and it was filed on July 7, 2003. Applicant has demonstrated use of its mark since 1998, long prior to its filing date; so Applicant has satisfied this aspect of the first condition precedent.

EFOL contends, however, that Applicant cannot satisfy the entirety of the first condition precedent because its adoption and use of the DELMONICO'S mark was

---

[72] *See Gray*, 3 USPQ2d at 1308 ("A valid application cannot be filed at all for registration of a mark without 'lawful use in commerce,' and, where a claim is made of concurrent rights such use must begin prior to the filing date of any application by a conflicting claimant to the mark.").

[73] Defendants' pending applications were filed after Applicant's application and they seek unrestricted registration. They are in suspension, in accordance with USPTO procedure. *See* TBMP § 1104 ("[I]f a party to the proceeding owns a conflicting application which seeks an unrestricted registration, and which was not filed until after the concurrent use application(s), the trademark examining attorney will suspend action on the subsequent unrestricted application (once the application is otherwise in condition for approval for publication) pending disposition of the concurrent use application(s).") *See Pro-Cuts v. Schilz-Price Enterprises Inc.*, 27 USPQ2d 1224, 1226 (TTAB 1993) (Board has no jurisdiction over a user's application pending before examining attorney unless application is amended to seek concurrent use, is published without successful opposition, and is added to the proceeding). *See also America's Best Franchising Inc. v. Abbott*, 106 USPQ2d 1540, 1544 (TTAB 2013). *See* discussion in the Board's order of February 13, 2014, 170 TTABVUE.

Concurrent Use No. 94002242

not in good faith, arguing that, without good faith, Applicant cannot have become

entitled to use its mark, or that any use of its mark was not "lawful."[74] The courts

have long recognized that, under common law principles, the entitlement to use a

mark may arise, notwithstanding the concurrent use of the same mark by another,

where the junior user adopts its mark in good faith and uses it in a territory

sufficiently remote from the other user to render confusion unlikely. *See Dawn*

*Donut Company, Inc. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 121 USPQ 430 (2d

Cir. 1959):

> Prior to the passage of the Lanham Act courts generally held that the owner of a registered trademark could not sustain an action for infringement against another who, without knowledge of the registration, used the mark in a different trading area from that exploited by the registrant so that public confusion was unlikely. [*Citing Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403 (1916); other citations omitted.] By being the first to adopt a mark in an area without knowledge of its prior registration, a junior user of a mark could gain the right to exploit the mark exclusively in that market.

121 USPQ at 433. *See also Woman's World Shops Inc. v. Lane Bryant Inc.*, 5

USPQ2d 1985, 1987-88 (TTAB 1988) ("concurrent rights arise where a party, in

good faith and without knowledge of a prior party's use in another geographical

area, adopts and uses the same or similar mark for the same or like goods or

services within its own geographical area with a measure of commercial success and

public recognition and without any resulting confusion as to source."). On the basis

of these principles, courts have stated that bad faith use of a mark could not

---

[74] EFOL's brief at 30-33, 196 TTABVUE 38-41.

28

Concurrent Use No. 94002242

constitute the "lawful use in commerce" required by Section 2(d). *Action Temporary Services Inc. v. Labor Force Inc.*, 870 F.2d 1563, 10 USPQ2d 1307, 1309 (Fed. Cir. 1989) (finding that use of a mark during the pendency of another's federal registration "cannot be deemed 'lawful use'" because of constructive notice arising from the registration; but that such constructive notice evaporated upon cancellation of the registration, rendering subsequent use "lawful" within the meaning of Section 2(d)); *see also* Rich, J., dissenting (arguing that even subsequent to cancellation of the registration, use was not "lawful").

EFOL contends that Applicant's lack of good faith is demonstrated by Applicant's "attempt to capitalize on Chef Emeril's reputation" by adopting another of EFOL's trademarks, namely, the mark BAM!, at roughly the same time that Applicant was developing its use of the DELMONICO'S mark. In April 2002, Applicant commenced packaging a seasoning powder in containers marked BAM!,[75] which it distributed at its DELMONICO'S restaurants. Applicant ceased use of this mark and destroyed its remaining container labels in May or June, 2008[76] in response to a cease-and-desist warning from EFOL.[77] In discussions regarding selection of a trademark for the spice powder, Applicant's witness noted, "Someone said something about that there was a chef on TV who said bam every time he put a

---

[75] Applicant's response to OL's Interrogatory no. 18, OL's notice of reliance Ex. B (response) and Ex. C (corrective supplemental response), 73 TTABVUE 31-50.

[76] Applicant's response to EFOL's second set of interrogatories, Interrogatory no. 2, OL's notice of reliance Ex. E, 73 TTABVUE 78-79; Wade, Sr. discovery dep. 200:6, EFOL's second notice of reliance, 86 TTABVUE 47.

[77] Cruz 190:23-24, 118 TTABVUE 197; Wade, Sr. 86:17-88:10, 138 TTABVUE 92-94.

29

A29

Concurrent Use No. 94002242

spice on something. So, they said why don't we call it bam?"[78] Applicant's principal

placed these discussions in 2000.[79] Applicant's principal stated, "At the time [2002]

I was aware that there was a chef using that term on television. … I was told or I'd

heard it from people in our organization. … I'd heard it from my father and I'd

heard it from Tom O'Brien."[80] Mr. O'Brien, Applicant's District Manager testified:

> I remember seeing a chef on the Food Network, he would
> add spice, and it would seem to me like he was trying to
> portray it as adding spice to make it hotter, you, Bam,
> so…
>
> …
>
> I had seen it on TV and we were having a conversation,
> we needed to find a name for it,… And I said well, what
> about Bam. And, you know, I had seen it other places, but
> I had remembered it from the chef on TV.[81]

The spice product was manufactured by a company called All Seasonings, and its

vice president Adam Moran was involved in the design of the packaging, in

cooperation with Applicant's director of operations James Monte. When Mr. Moran

received instructions to place the mark BAM on the label, he sent a draft design of

the label to Mr. Monte with the following annotation in the right margin: Jim

worrie[ ] about BAM in Reference TO Emerie[ ] Lagasse please call me."[82] He

testified, "At that time when this was being developed I know that Emeril Lagasse

---

[78] Wade, Sr. discovery dep. 187:7-11, EFOL's second notice of reliance, 86 TTABVUE 36; Wade, Sr. 67:24-68:13, 138 TTABVUE 67-68.

[79] Wade II 83:24-84:7, 139 TTABVUE 90.

[80] Wade II discovery dep. 30:5-14, EFOL's third notice of reliance, 87 TTABVUE 11.

[81] O'Brien 16:6-11; 17:6-14, 127 TTABVUE 22-23.

[82] Moran Ex. 4 (the annotation is somewhat cut off at the right margin), 108 TTABVUE 48-50. *See also* Moran Ex. 7 (version of same draft design page, marked with further instructions requesting exclamation mark and starburst carrier), 109 TTABVUE 41-42.

Concurrent Use No. 94002242

had used that word bam in his repertoire. … I seen him on TV. … His food show on the Food Network."[83] When asked why the use of BAM worried him, he replied, "Basically just giving the customer, you know, our thought on whether or not they should check that out to make sure that things were okay to use that."[84]

Mr. Lagasse is very well known for exclaiming "Bam!" when he adds garlic, seasonings, or an indulgent quantity of an ingredient to the dishes he prepares on his cooking shows. This is well demonstrated in the record.[85] This proclivity has been noted in national publications such as <u>Newsweek</u>, <u>People</u>, <u>Playboy</u>, <u>Good Housekeeping</u>, <u>Daily Variety</u>, <u>The Sporting News</u>, and <u>Advertising Age</u>; and in local publications across a wide swath of the United States, including New York. The record shows that EFOL used BAM! as a mark on a seasoning product called "Southwest Spice" in 1994 or 1995, on a four-pack of seasonings in 2002-2003, and on stainless steel cookware.[86]

EFOL contends that before Applicant expanded beyond its initial location in Syracuse, it had knowledge of Mr. Lagasse's use of the designation BAM! and displayed its lack of good faith in its expansion by marketing a spice product that bore on its packaging both the mark BAM! and the name DELMONICO'S.[87] EFOL argues that "even if the junior user's initial adoption of the mark is in good faith,

---

[83] Moran 20:15-25, 108 TTABVUE 24.

[84] Moran 21:3-6, 108 TTABVUE 25.

[85] EFOL's ninth notice of reliance, Ex. C (press notices remarking on Mr. Lagasse's use of "Bam!"), 95 TTABVUE 180-300, 96 TTABVUE 1-79.

[86] Cruz Ex. 82, 84, and 85, 120 TTABVUE 128-135.

[87] EFOL's brief at 31, 196 TTABVUE 39.

A31

Concurrent Use No. 94002242

any subsequent expansion under the mark must also be made in good faith," citing

*Weiner King, Inc. v. The Wiener King Corporation*, 615 F.2d 512, 204 USPQ 820, 829

(CCPA 1980). We note, however, that *Weiner King* acknowledged a distinction

between adoption of a mark with knowledge and expansion of trading area with

knowledge:

> The only basis urged by Weiner King for absence of good faith on the part of WKNC is the fact that WKNC expanded out of North Carolina with notice of Weiner King's existence and use of its WEINER KING mark. We hold that this reason is legally insufficient to support a finding of bad faith. … While an attempt to "palm off," or a motive to "box in" a prior user by cutting into its probable area of expansion, each necessarily flowing from knowledge of the existence of the prior user, might be sufficient to support a finding of bad faith, mere knowledge of the existence of the prior user should not, by itself, constitute bad faith. …
>
> … While it is clear that appropriation of a mark with knowledge that it is being used by another is not in good faith, it does not follow that a later user who has adopted in good faith must forego any further expansion after learning of the prior user. We believe that, even under the common law, such an issue depends on such factors as natural area of expansion, the possibility of encroachment on the area of the other party, and other equitable considerations.

204 USPQ at 829 & n.6.

  In any event, the fact that Applicant's personnel had been exposed to the

activities of Mr. Lagasse and even had knowledge of his use of BAM! does not prove

that they had knowledge of his prior use of the DELMONICO mark. The record

does not support a finding that Applicant had knowledge of use of the

DELMONICO designation by either of the Defendants at the time Applicant

32

Concurrent Use No. 94002242

adopted the DELMONICO'S mark. Applicant stated that it first learned of such use

by both Defendants in 2005, when each Defendant instituted an opposition

proceeding against registration of Applicant's mark.[88] Mr. Wade, Sr. admitted that

at the time he was considering adopting the DELMONICO'S mark (1997-1998), he

was aware of the historic New York City restaurant, but had been told it was

closed.[89] There is no reason to doubt Applicant's testimony, because for most of 1997

and much of 1998, OL's restaurant was indeed closed and EFOL's New Orleans

restaurant was not open for business. Moreover, neither Defendant had ever

operated a restaurant under a relevant mark in geographic proximity to any of

Applicant's New York restaurants.[90] Thus, even if Applicant had knowledge of

Defendant's prior common law uses, such knowledge would not necessarily obviate

good faith on the part of Applicant, as Applicant could have believed that its

adoption was sufficiently remote so as to make confusion unlikely. Accordingly, we

find that Applicant has fully satisfied the first condition precedent of Section 2(d) by

---

[88] Applicant's responses to Interrogatories nos. 15 and 16 of EFOL, see OL's notice of reliance, Ex. D, 73 TTABVUE 68; Wade II 56:14-19, 139 TTABVUE 63; *see also* Wade, Sr. 66:19-67:6-11, 138 TTABVUE 72-73; Monte 15:12-21, 136 TTABVUE 21 (learned of Las Vegas restaurant in 2005 when visiting Las Vegas); O'Brien 14:8-12, 127 TTABVUE 20 (learned of Las Vegas restaurant in 2004 or 2005 from a friend).

[89] Wade, Sr. 111:25-112:2, 138 TTABVUE 117-118.

[90] *See CDS Inc. v. I.C.E.D. Management Inc.*, 80 USPQ2d 1572, 1580 (TTAB 2006) (referring to the "condition precedent" of "lawful use in commerce outside of the conflicting claimant's area.").

33

Concurrent Use No. 94002242

demonstrating its entitlement to use its mark in Syracuse, Albany, Rochester, and Utica as a result of lawful use of the mark in those geographic areas.[91]

B.    Proposed "conditions and limitations."

In order to determine whether Applicant is entitled to a concurrent use registration, the Board must determine whether likelihood of confusion as between Applicant and Defendants can be obviated by imposition of "conditions and limitations as to the mode or place of use of the marks or the [services] on or in connection with which such marks are used." 15 U.S.C. § 1052(d). The only "conditions and limitations" proposed by Applicant are the geographic restrictions set forth in the application. Applicant submits that it is entitled to a registration that covers the entire United States except the specific geographic areas in New York state, Louisiana, and Nevada that the application concedes to Defendants. Defendants, for their part, do not admit that any geographic limitations on their rights are warranted; their pending applications (which are not involved in this proceeding) request unrestricted registrations.[92] They contend that Applicant is not

---

[91] We note Applicant's plan to use its mark in Orlando, but at the time of trial Applicant had not opened its Orlando restaurant. Likewise, neither Defendant has operated a restaurant under a DELMONICO mark in the vicinity of Orlando.

[92] In the instant case we need only determine whether Applicant has carried its burden of proving that no likelihood of confusion of consumers will result from concurrent use of the marks as contemplated by its application. Applicant has no burden to prove that the potentially overlapping uses by the two Defendants would not result in confusion. Thus, the fact that the Defendants' respective applications do not contemplate restrictions that would allow them to continue use of their marks in a manner that would not cause confusion presents no impediment to Applicant's ability to bear the burden of proof it assumes as plaintiff in this proceeding. Had all of the involved parties wished to settle this case on terms that would allow all of their respective applications to move forward toward registration, they could have addressed the potentially conflicting uses of the Defendants.

34

Concurrent Use No. 94002242

entitled to any registration; and, in the alternative, they urge that, if any registration is to be granted to Applicant, it should be restricted to a narrower geographic region than what Applicant requests.

The seminal case of *In re Beatrice Foods Co.*, *supra*, stated:

> We have concluded that in concurrent use proceedings in which neither party owns a registration for the mark, the starting point for any determination as to the extent to which the registrations are to be territorially restricted should be the conclusion that the prior user is prima facie entitled to a registration covering the entire United States. Such a prior user, who applies for a registration before registration is granted to another party, is entitled to a registration having nationwide effect no less than if there were no concurrent user having registrable rights.

166 USPQ at 436. As Applicant is not the most senior user in this proceeding, the *prima facie* "starting point" described in *Beatrice Foods* does not inure to Applicant's benefit. However, a junior user may certainly prove, in an appropriate case, its entitlement to the entire United States with the exception of the senior user's existing territory. *See Weiner King, Inc. v. The Wiener King Corporation*, 615 F.2d 512, 204 USPQ 820 (CCPA 1980); *Boi Na Braza, LLC v. Terra Sul Corp.*, 110 USPQ2d 1386 (TTAB 2014); *America's Best Franchising Inc. v. Abbott*, 106 USPQ2d 1540 (TTAB 2013). In this regard, Applicant contends as follows:

> Even if [Applicant] were a junior user, the fact that it was the first to file an application for federal trademark registration freezes any senior user's rights under the current effect of the Lanham Act. The *Beatrice Foods* case was decided before the amendments to the Lanham Act provided for constructive nationwide notice as of the filing

---

Instead, Applicant's case has been tried on its merits; and the conflict, if any, between the Defendants waits for another day and another case.

Concurrent Use No. 94002242

> date of an application for registration that eventually
> issues to registration, instead of constructive nationwide
> notice as of the (later) registration issue date. Such
> amendments strongly support the freezing of the non-
> applicant's trademark rights as of the date of filing an
> application for federal trademark registration.[93]

Applicant's argument appears to conflate the constructive notice provision of

Section 22, 15 U.S.C. § 1072,[94] with the constructive use provision of Section 7(c), 15

U.S.C. § 1057(c).[95] Constructive notice under Section 22 attaches only to an existing

registration, by the express terms of that provision, and is accordingly inapplicable

to Applicant's pending application. As for Section 7(c), even though we give

provisional consideration in Board proceedings to the filing date of a pending

application (as the applicant's constructive date of first use), an applicant's

constructive use has little (if any) significance in a concurrent use proceeding, in

which the applicant must demonstrate *actual* use of its mark prior to the filing date

of any involved application, and not necessarily prior to the first use of any involved

excepted users.

  Applicant argues more generally that, because it "was the first to apply for a

federal trademark registration," it should enjoy the benefit of a policy "encouraging

trademark owners to apply promptly for federal registration of their trademarks."[96]

---

[93] Applicant's brief at 16, 130 TTABVUE 21.

[94] "Registration of a mark on the principal register … shall be constructive notice of the registrant's claim of ownership thereof."

[95] "Contingent on the registration of a mark on the principal register …, the filing of the application to register such mark shall constitute constructive use of the mark, conferring a right of priority, nationwide in effect …"

[96] Applicant's brief at 15-16, 130 TTABVUE 20-21.

Concurrent Use No. 94002242

Applicant cites *Beatrice Foods*.[97] EFOL argues vigorously that no such policy exists.[98] To the extent that our principal reviewing Court and the Board[99] have discussed a policy favoring the first to register or the first to apply for registration, it is treated as a factor that is very much subordinate to the statutory considerations at the heart of a concurrent use analysis, *i.e.*, the determinations as to whether a party is entitled to use its mark and as to whether confusion is not likely. 15 U.S.C. § 1052(d). Any policy favoring those who apply for registration cannot, alone, automatically establish a party's entitlement to use its mark in the majority of the geographic United States if consumer confusion is likely to result, in contravention of Section 2(d).

On this record, Applicant has demonstrated its common law entitlement to use its mark, in the manner in which it currently does so, in its current geographic locations in Syracuse, Utica, Albany, and Rochester. In a case as complex as this

---

[97] That case does refer to a "policy of rewarding those who first *seek* federal registration …." 166 USPQ at 436 n.13 (emphasis added). However, *Beatrice Foods* was a case in which the prior user was also the prior *registrant*, and the "policy" is mentioned in the context of speculation as to what would happen where "the prior user does not apply for a registration before *registration is granted* to another … " *Id.* (emphasis added).

In *Weiner King*, the junior user was favored in part because it was the prior *registrant*; and the Court referred to a "policy of encouraging prompt *registration* of marks by rewarding those who first *seek* registration under the Lanham Act." 204 USPQ at 830 (emphasis added).

In *Giant Food Inc. v. Malone & Hyde, Inc.*, 522 F.2d at 1396, 187 USPQ 374 (CCPA 1975), the Court said, "The winner of the race for [virgin territory], according to our system of federal registration, is the senior user at least in those instances where he is also the first to *apply for* a federal registration." 187 USPQ at 382 (emphasis supplied). But *Giant Food* was not considering a situation in which a junior user was favored for being first to file, because in that case it was the *senior* user that filed first.

[98] EFOL's brief at 40-43, 196 TTABVUE 48-51.

[99] *See Boi Na Braza, LLC v. Terra Sul Corp.*, 110 USPQ2d at 1394; *America's Best Franchising Inc. v. Abbott*, 106 USPQ2d at 1553.

Concurrent Use No. 94002242

one, the determination as to whether Applicant is entitled to a geographically restricted registration and, if so, the territory to be delineated in such registration must await a full analysis of whether confusion is likely to arise from Applicant's use of its mark concurrent with the use of Defendants. We turn now to that question.

C.    Likelihood of confusion.

The second condition precedent to the issuance of a concurrent use registration is that there be no likelihood of confusion, mistake, or deception in the marketplace as to the source of Applicant's services resulting from the concurrent use of its mark. Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion, as set forth in *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973).

(1)    The marks.

We first compare the marks in terms of their appearance, sound, meaning, and overall commercial impression. *E.g.*, *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin,* 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005). The marks at issue are essentially identical. Applicant seeks to register the mark DELMONICO'S. OL's mark is identical, and EFOL has demonstrated that it uses the mark in the form DELMONICO. No meaningful distinction arises from the possessive form of Applicant's mark. *Wilson v. Delaunay*, 245 F.2d 877, 114 USPQ

38

Concurrent Use No. 94002242

339, 341 (CCPA 1957); *In re Binion*, 93 USPQ2d 1531, 1534 (TTAB 2009). The marks are obviously virtually identical in appearance and sound.

With respect to the meaning of the marks, we note that, according to lore, DELMONICO was the surname of the founders of the historic New York City restaurant; and there is evidence that Applicant, in selecting the mark, considered that it resembled a person's surname. Wade, Sr. 8:23-9:7.[100] We also note evidence suggesting that DELMONICO has significance as the name of a cut of steak that is offered in the parties' restaurants.[101] However, there is no clear evidence to explain what the exact meaning of "Delmonico steak" may be, or how that term is understood by the relevant public. In any event, in view of the virtual identity among the marks, there is no reason on this record to believe that they would not share the same significance. Accordingly, we find them to be essentially identical in meaning and overall commercial impression.

Despite the potential of the marks to be perceived as a surname or as the name of a type of steak, no party to this proceeding has argued that the DELMONICO designation is inherently weak in any way and the evidence of record is too scant to support a finding of inherent weakness. Moreover, all three marks have already enjoyed vigorous use over a long period of time, such that on this record there is no reason for us to treat the marks at issue as weak.

---

[100] 138 TTABVUE 14-15. *See also* Applicant's response to OL's Interrogatory no. 1, OL's notice of reliance, Ex. A, 73 TTABVUE 17-18.

[101] Wade, Sr. discovery dep. 28:6-22, OL's notice of reliance, Ex. N, 73 TTABVUE 257; Applicant's response to OL's Interrogatory no. 1, OL's notice of reliance, Ex. A, 73 TTABVUE 17-18; Wade II 11:3-12:10, 139 TTABVUE 18-19; Monte 10:9-22, 136 TTABVUE 16.

Concurrent Use No. 94002242

(2)    <u>The services; trade channels; customers</u>.

Applicant seeks to register its mark for "Restaurant services." In the context of a concurrent use proceeding, the question of registrability of an applicant's mark must be decided on the basis of the recitation of services set forth in the application, because the terms of the application define the scope of registration that Applicant seeks. *See Octocom Syst. Inc. v. Houston Computers Svcs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990); *Turdin v. Trilobite, Ltd.*, 109 USPQ2d 1473, 1481 (TTAB 2014); *America's Best Franchising*, 106 USPQ2d at 1549. Where an applicant identifies its services broadly, we must presume that the services encompass all services of the type identified. *In re Jump Designs LLC*, 80 USPQ2d 1370, 1374 (TTAB 2006). "Restaurant services," as identified in the application, encompass the services of both Defendants and, accordingly, we must deem the services at issue to be identical.

At trial, Applicant emphasized the difference in nature as between its moderately priced restaurant on the one hand and, on the other, EFOL's high-end restaurants under the direction of a celebrity chef, and OL's high-end restaurant associated with a particular historic location. Applicant's representative stated that he was not concerned about confusion with OL's Manhattan restaurant because, "Totally different kind of restaurant. It's a market we are not at all interested in."[102] He also suggested that if the "concept" of a restaurant were different, there would be less

---

[102] Wade, Sr. discovery dep. 225:16-19, OL's notice of reliance, Ex. N, 74 TTABVUE 12.

Concurrent Use No. 94002242

chance of confusion.[103] Testimony at trial does suggest that the difference in nature between Applicant's business and those of Defendants might be a valid basis for finding that coexistence without likelihood of confusion is feasible. For example, OL's managing partner Dennis Turcinovic testified that he had purchased cigarettes at a "Delmonico Gourmet Deli" in Manhattan in about 2001, but felt no concern about the existence of that business. "I figured that they were two completely different style businesses. … They are more of a fast food restaurant."[104] Similarly, OL's principal Milan Licul testified that he was aware of two Manhattan locations of "Delmonico Gourmet Deli," but they did not cause concern. "They're a deli. We are a high-end restaurant, we are white tablecloth restaurant. Two different things."[105] Mr. Lagasse acknowledged that there was a Delmonico restaurant on Lucinda Boulevard in Los Angeles; but that he was not bothered by it because that is not a geographic area in which he would do business; and because the restaurant was little known.[106] However, no party, including Applicant, has suggested a manner in which the nature of Applicant's restaurants could be specifically defined in the registration that Applicant seeks so as to avoid confusion with the types of restaurants operated by OL and EFOL; and the issue has not been

---

[103] *Id.*, 39:20-40:9, EFOL's second notice of reliance, 86 TTABVUE 11-12.

[104] Turcinovic 126:9-14, 182 TTABVUE 129.

[105] Licul 115:17-21; 116:18-23, 190 TTABVUE 101, 102.

[106] Lagasse discovery dep. 105:24-25; 106:7-13; 140:3-25, OL's notice of reliance, Ex. M, 73 TTABVUE 232-233, 235.

Concurrent Use No. 94002242

tried.[107] Accordingly, we interpret Applicant's application according to its terms and note that, if a registration issues to Applicant for "restaurant services," it will include within its scope restaurants of all kinds and all price ranges.

Applicant's application does not request any "conditions and limitations as to the mode … of use" of its mark with respect to specific trade channels or classes of customers. Because Applicant's restaurant services, as identified, are unrestricted, we must presume that they will move through all channels of trade that are normal for such services and be available to all types of customers for such services, including the channels and customers appropriate to both Defendants. *See Octocom,* 16 USPQ2d at 1787; *Paula Payne Products Co. v. Johnson Publishing Co.*, 473 F.2d 901, 177 USPQ 76 (CCPA 1973); *In re Linkvest S.A.,* 24 USPQ2d 1716, 1716 (TTAB 1992).

(3)     Fame and geographic extent of reputation.

In a concurrent use proceeding, the fame and extent of reputation of all of the parties have a bearing on the analysis of likelihood of confusion. Accordingly, we consider each party in turn.

(a)     Applicant.

The record indicates that the reputation of Applicant's restaurants is local in nature. With respect to customers, Applicant's representative stated, "All of our customers are located near the New York State Thruway. So, we get some people traveling back and forth in the local area, as I said before, probably within 30 miles

---

[107] We note that Applicant could have moved to amend the identification of services in its application under 37 C.F.R. § 2.133; *see* TBMP § 514.

Concurrent Use No. 94002242

or less."[108] The evidence shows that Applicant has run print advertisements in local newspapers; has used billboards in Syracuse; has run 60-second radio ads on local stations in Utica, Albany, Rochester, and Syracuse; and maintains an internet website.[109] Over the course of many years, Applicant sponsored a radio program hosted by Syracuse University's basketball coach Jim Boheim, which was broadcast from Applicant's Syracuse restaurant.[110] Applicant prepared two television commercials that have aired "hundreds of times" in each of its four New York markets.[111]

(b) OL.

OL enjoys a peculiar form of renown, because the press and public are very willing to conflate the identities of OL's restaurant with that of the historic Delmonico previously located at the same address. Shortly after the restaurant's opening, The New York Times stated, "Delmonico's, possibly the most famous name in American restaurant history, is once again in the news";[112] and "Delmonico's, in the financial district, has a proud history, and it looks the part. … [I]t would be easy to believe the restaurant had been operating without interruption since the turn of the century …"[113] In 2009, Financial Times referred to OL's restaurant as "Delmonico's,

---

[108] Wade, Sr. discovery dep. 48:21-49:5, 86 TTABVUE 17-18.

[109] Wade II 27:8-33:6, 139 TTABVUE 34-40; Wade, Sr. 41:15-42:18, 59:16-65:11, 138 TTABVUE 47-48, 65-71.

[110] Wade II 50:8-53:12, 139 TTABVUE 57-60.

[111] Wade, Sr. 40:2-41:7, 138 TTABVUE 46-47.

[112] "A New Delmonico's," The New York Times, May 13, 1998, p. F9, OL's notice of reliance Ex. P, 74 TTABVUE 107-109.

[113] "Diner's Journal," The New York Times, June 5, 1998, p. E43, id., 74 TTABVUE 110-112.

Concurrent Use No. 94002242

the 181-year-old fine dining restaurant …"[114] In 2010, <u>Esquire</u>, after a summary of the historic restaurant's two-century history, said, "the Beaver Street restaurant, with its marble portals from Pompeii, is still going strong."[115] Although most of the publicity is from New York-based media outlets, some appears to have national scope, such as a recommendation in <u>Time</u> magazine online ("the 170-year-old financial district institution")[116] and a comedy skit on the television show "Saturday Night Live" satirizing a Wall Street banker ("One week, you're tucking in to a $60 steak at Del Monico's… [*sic*] the next, you find yourself in a Greyhound bus station wrestling a TODDLER for his Lunchables!").[117] OL's restaurant was also featured on the television shows "Good Morning America"[118] and "Unwrapped."[119] The record also includes numerous reviews from OpenTable.com[120] and Zagat.com,[121] some of which refer to OL's restaurant as an "institution," an "icon," and "historic." An article published in Ohio discussing a new local restaurant called "Delmonico's Steakhouse" acknowledges "Even the restaurant's name was an interesting choice, because it comes with a lot of built-in brand equity. Still going strong in New York

---

[114] "Wall Street drowns its sorrows," <u>Financial Times, FT Weekend</u>, November 29, 2008, p. 21, *id.*, 74 TTABVUE 123-126.

[115] "America's Five Best Restaurants Older Than 100," <u>Esquire</u>, June 14, 2010 (online), *id.*, 74 TTABVUE 140-141.

[116] "Week in Travel - Best Deals and Destinations," <u>Time</u> (online), January 16, 2009, Turcinovic Ex. 39, 189 TTABVUE 3-6.

[117] "Weekend Update" transcript, Turcinovic Ex. 43, 189 TTABVUE 17-20; the witness confirmed having seen the skit on the air. Turcinovic 117:13-15, 182 TTABVUE 120.

[118] Turcinovic Ex. 35 (DVD).

[119] Turcinovic Ex. 34 (DVD).

[120] Turcinovic Ex. 15, 186 TTABVUE 3-14.

[121] Turcinovic Ex. 17, 186 TTABVUE 17-26.

44

Concurrent Use No. 94002242

City, the original Delmonico's is synonymous with the term 'steakhouse' for many people, even those who may have never eaten there."[122]

Although there is no business relationship between OL and the historic Delmonico restaurant (and OL does not claim that there is any), members of the public (and sometimes the press) do not necessarily appreciate the niceties of trademark ownership and continuity of business goodwill. Goodwill arising from operations of the historic Delmonico restaurant does not, in any legal sense, inure to OL's benefit. Nonetheless, the fact that OL operates a restaurant that emulates the historic Beaver Street restaurant and does so at the same street address clearly has generated a heightened degree of interest and excitement among the press and the public, which has redounded to the benefit of OL. At the very least, it resulted in virtually instantaneous name recognition upon the opening of OL's restaurant.

(c) **EFOL**.

EFOL contends in its brief that its mark DELMONICO is nationally famous and that it benefits from the fame of EFOL's principal, Emeril Lagasse. It is the duty of the party asserting that its mark is famous to clearly prove it. *Leading Jewelers Guild Inc. v. LJOW Holdings LLC*, 82 USPQ2d 1901, 1904 (TTAB 2007). There is no question on this record that Mr. Lagasse is famous and that he has made successful use of his fame and his access to publicity in promoting EFOL's DELMONICO restaurants. As a result, even though EFOL's DELMONICO mark

---

[122] "Retro In All The Right Ways," Restaurant Hospitality, November 2004, p. 19ff., Wade, Sr. discovery dep., Emeril Ex. 13, OL's notice of reliance Ex. N, 74 TTABVUE 47-49.

Concurrent Use No. 94002242

may not be truly famous, it enjoys a very substantial degree of renown throughout much of the United States.

Mr. Lagasse is well known and highly regarded as a chef of fine cuisine. OL's managing partner agreed that it would be fair to characterize him as "a well-known celebrity chef" with "a national reputation."[123] At the time of trial, Mr. Lagasse, through his associated corporations, directed the operation of 10 high-end restaurants: three in New Orleans, three in Florida, three in Las Vegas, and one in Pennsylvania. (During the pendency of this proceeding, two of his other restaurants, in Mississippi and Georgia respectively, had closed.)[124] Beginning in 1992, he starred in a series of television shows about cooking on what is now called The Food Network. Some of them apparently had only limited success, such as "How to Boil Water," "Emeril & Friends," and "Emeril Green." In 1994, he appeared in "Essence of Emeril," which was a substantial success and remained in production until 2008.[125] In 1997, he commenced production of an hour-long cooking show called "Emeril Live," which was taped before a live audience and broadcast in prime time on The Food Network. Another substantial success, it remained in production until 2007 under a contract for 90 shows per year plus two to four specials.[126] Mr. Cruz, who negotiated the contracts with the Food Network, testified that The Food Network at the time reached between 55 and 57 million households, and that at the

---

[123] Turcinovic discovery dep. 37:3-7, EFOL's 6th notice of reliance, 91 TTABVUE 12.

[124] Cruz discovery dep. 11:16-12:24, OL's notice of reliance Ex. L, 73 TTABVUE 132. Cruz 46:16-50:8, 118 TTABVUE 53-57.

[125] Cruz 15-20, 118 TTABVUE 22-27.

[126] *Id*. 22:6-25:25, 118 TTABVUE 29-32.

Concurrent Use No. 94002242

time of trial it reached more than 90 million households.[127] Mr. Lagasse was the food correspondent for ABC's "Good Morning America" for 10 years, making 20 to 25 appearances annually.[128] At the time of trial, Mr. Lagasse had published 13 books, and Mr. Cruz expected to have 20 books in the market in the future.[129] EFOL's retail sales of merchandise in 2010 were in excess of $100 million.[130]

  Mr. Lagasse's celebrity resulted in substantial interest in his re-opening of the DELMONICO restaurant in New Orleans. EFOL has made of record numerous news items taking note of the New Orleans DELMONICO restaurant. Aside from Louisiana publications, such news items appeared in publications in Atlanta, New York City, Boston, Cincinnati, St. Louis, Wilmington NC, and Chicago. They also appeared in national publications including USA Today, Good Housekeeping, Playboy, Working Woman, Food Network Magazine, Physicians' Travel, and the Associated Press Wire.[131] The New York Times, in a lengthy and objective review, repeatedly refers to the restaurant as a "landmark."[132] EFOL has also submitted news reports anticipating the 1998 opening of the New Orleans DELMONICO restaurant. In part, media attention was drawn to a book tour of Mr. Lagasse, in the course of which he promoted his new DELMONICO project. Articles of record appeared in publications in Philadelphia, Dallas, Port St. Lucie, FL, Palm Beach,

---

[127] *Id*. 28:13-16; 28:25-29:15, 118 TTABVUE 35.

[128] *Id*. 29:24-30:11, 118 TTABVUE 36-37.

[129] *Id*.

[130] *Id*. 44:2-3, 118 TTABVUE 51.

[131] EFOL's ninth notice of reliance, Ex. A, 95 TTABVUE 11-140.

[132] *Id*., 95 TTABVUE 72-76.

47

Concurrent Use No. 94002242

Atlanta, New Orleans, Newark, and Houston.[133] In many of these locations, Mr.
Lagasse made personal appearances for book signings, which attracted crowds. Also
of record are press notices regarding EFOL's Las Vegas DELMONICO restaurant
for every year from 1998 (before opening) to 2010. Such notices appeared in
publications in Nevada, California, Tennessee, Illinois, Kansas, New York,
Louisiana, Arizona, New Jersey, Texas, Wisconsin, and Delaware; and in national
publications including USA Today, Wine Spectator, Gourmet, People, Advertising
Age, Incentive, Restaurant and Institutions, Business Credit, Business Wire, and
PR Newswire.

  Mr. Lagasse used his television appearances to promote the DELMONICO
restaurant. At least six episodes of "Emeril Live," taped and broadcast in 1997 and
1998, were devoted to his preparation of "classic" dishes associated with the
restaurant, accompanied by much promoting of the quality and history of the
restaurant.[134] In 2009, a season finale of the Bravo series "Top Chef," for which Mr.
Lagasse was a guest judge, was filmed inside the New Orleans DELMONICO
restaurant. The contestants were shown dining there and doing their cooking
preparations in its kitchen. The episode included short videos showing the
DELMONICO restaurants from inside and out.[135]  It aired "many times" on Bravo
network.[136]

---

[133] EFOL's ninth notice of reliance, Ex. B, 95 TTABVUE 141-179.

[134] Cruz Ex. 37, 42 52 and 57 (DVDs), 124 TTABVUE.

[135] Cruz Ex. 52 (DVD), 124 TTABVUE.

[136] Cruz 121:14-19, 118 TTABVUE 128.

Concurrent Use No. 94002242

In 2005, EFOL issued a cookbook entitled *Emeril's Delmonico Cookbook: A Restaurant with a Past*, which featured the history and recipes of the New Orleans DELMONICO restaurant. Approximately 150,000 copies of the book were sold, generating revenues over $1 million. Mr. Lagasse conducted a book signing tour and "satellite media tour" in 2005, making appearances in New York, California, New Jersey, North Carolina, Pennsylvania, Texas, Illinois, and Texas. The media tour included coverage by national news outlets and outlets in Ohio, Utah, Alabama, Wisconsin, Arizona, Colorado, Texas, California, and Illinois, and on the "Tonight Show," "Good Morning America," the "Tony Danza Show," and National Public Radio.[137]

In order to demonstrate that customers for its restaurants are located throughout the United States, EFOL presented detailed reports of data relating to American Express charges made at its restaurants in calendar year 2008. The reports were prepared by American Express for its customer EFOL in the ordinary course of American Express' business and were introduced under the testimony of Jay Falcon,[138] a product manager for American Express. For the New Orleans DELMONICO restaurant, the data show American Express charges by persons with addresses in 48 states and the District of Columbia. Among these, persons with addresses in New York account for 9% of the charges and persons in Florida account for 6%. Each of nine states sent more than 100 customers to the

---

[137] Cruz 128:21-131:5 and Cruz Ex. 55 (schedule), 118 TTABVUE 135-138 and 119 TTABVUE 262-266; *see also* EFOL's ninth notice of reliance, Ex. E (press notices), 96 TTABVUE 219-242.

[138] 116-117 TTABVUE.

49

Concurrent Use No. 94002242

restaurant.[139] For the Las Vegas restaurant, 50 states and the District of Columbia are represented; persons with addresses in New York account for 7% of the charges and persons in Florida account for 5%. Four states sent more than 1000 customers to the restaurant, and 30 states sent more than 100 customers to the restaurant.[140]

EFOL also prepared and made of record tabulations of the reservations made in its two DELMONICO restaurants from January 1 to August 9, 2010, sorted by telephone area code.[141] Then, by reference to a listing of area codes published by the North American Numbering Plan Administration,[142] EFOL prepared tabulations that set forth the states indicated by the area codes.[143] Our review indicates that area codes in New York state accounted for 1198 reservations at the New Orleans restaurant and 2743 reservations at the Las Vegas restaurant; these counts coincide with the counts set forth by EFOL on its charts at Cruz Exhibits 93 and 94.[144]

Although we do not find EFOL's DELMONICO mark to be famous for purposes of analysis under Section 2(d), the evidence does demonstrate that its reputation has spread through a substantial portion of the United States.

---

[139] Falcon Ex. 100, 117 TTABVUE 3-43.

[140] Falcon Ex. 101, 117 TTABVUE 44-85.

[141] Cruz Exhibits 89-92, 120 TTABVUE 142-189.

[142] EFOL's 9th notice of reliance, Ex. F, 96 TTABVUE 243-256.

[143] Cruz Ex. 91 (the New Orleans restaurant); and Ex. 92 (the Las Vegas restaurant), 120 TTABVUE 166-176, 177-189.

[144] 120 TTABVUE 190-193.

50

A50

Concurrent Use No. 94002242

(4)    <u>Actual confusion</u>.

The parties have adduced a few accounts of what they contend to be instances of actual confusion as to source relating to the restaurants at issue. Only one relates to a restaurant of Applicant; it was recounted by Applicant's district manager:

> Actually happened, I'm going to say, about four months ago. I had a couple that came in, in Rochester, had eaten and came up to the front desk and asked me, are you affiliated with Emeril's Delmonico's. And I said no, absolutely not. And it's funny, because the conversation ended right then and there, and they just left and I said, have a great night.

O'Brien 18:18-19:17, 127 TTABVUE 24-25.

The other incidents relate to confusion as between Defendants' restaurants. Judith Choate, a food writer and consultant who assisted with a book about OL's restaurant, recounted the following incident from 2006 or 2007:

> In the Delmonico's at 56 Beaver Street, I often would stay in the restaurant. And one night, four women came in and asked if this was Emeril's Delmonico, and I said, no, it was not. And they felt, I guess, upset.

Choate 27:6-15, 84 TTABVUE 9. When asked what the women said exactly, she stated, "Is this Emeril's Delmonico?" *Id*. 28:20-29:24, 84 TTABVUE 10-11. When asked how she knew they were upset, she replied, "Just their body demeanor seemed to be upset." *Id*. 39:4-5, 84 TTABVUE 21.

Both OL's general manager and managing partner were aware of customers inquiring about an affiliation between their restaurant and Mr. Lagasse or his Delmonico restaurant. Goglia 27:19, 179 TTABVUE 30; Turcinovic 147:17, 182 TTABVUE 150. Mr. Turcinovic testified with respect to two incidents. In the first, a

Concurrent Use No. 94002242

group appeared at OL's Manhattan restaurant, thinking they had previously made a reservation. However, the Manhattan OL restaurant had no record of the reservation because, as it turned out, the group had unwittingly made the reservation at EFOL's Las Vegas location:

> I had a walk-in of 7 people, I would say about six months ago. They had not made a reservation. I didn't have them in the reservation book. They made the reservation at the Las Vegas location. And we served them dinner, we called the Vegas location and cancelled the reservation. That's one time.

Turcinovic, 148:4-11, 182 TTABVUE 151.

> I recall a customer asking if this is the original Delmonico's restaurant and if we owned the one in Vegas."

Turcinovic, 150:5-151:8, 182 TTABVUE 153.

Mr. Lagasse testified in a discovery deposition:

> I have had several people ask me, approach me if that New York restaurant was my restaurant. And I've had some people that have said to me, that was a really fantastic dinner we had at your restaurant in New York last night and, unfortunately, I have to correct them.

Lagasse discovery dep. 75:13-22.[145] He testified that one of the incidents occurred

"at a book signing several years ago in the greater Triborough area." *Id*. 76:12-15.

EFOL's chief financial officer testified, when asked about confusion with OL's restaurant, "Me personally being involved in any inquiry of conversation, I recall it happening to me personally maybe twice." Cruz discovery dep. 156:10-20.[146]

---

[145] OL's notice of reliance, Ex. M, 73 TTABVUE 223.

[146] OL's notice of reliance, Ex. L, 73 TTABVUE 147.

Concurrent Use No. 94002242

Finally, OL stated in response to an interrogatory that it was aware of telephone inquiries as to whether its restaurant was related to EFOL's New Orleans and Las Vegas restaurants, and of one visitor to OL's restaurant who asked whether the restaurant was related to EFOL's Las Vegas restaurant.[147]

These anecdotes reflect two distinct types of events. Two instances—Mr. Turcinovic's recounting of the party of 7 who made a reservation at Mr. Lagasse's Las Vegas restaurant, and Mr. Lagasse's testimony about people stating, mistakenly, that they previously had eaten in his New York restaurant—are evidence of actual confusion. Instances of people inquiring of affiliation between the parties is, at best, much less probative.[148] Still, viewing these anecdotes together, we find that they are relevant to an assessment of potential likelihood of confusion and that they tend to show that confusion is indeed likely. These incidents also illustrate the geographic reach of the reputation of EFOL's Delmonico restaurant into the state of New York.

[147] OL's response to Interrogatory no. 12(a) of EFOL's first set of interrogatories, EFOL's seventh notice of reliance, Ex. A, 98 TTABVUE 9-10. Further, we would note that these instances did not involve Applicant and involved two restaurants that are costlier than those of Applicant. Nevertheless, because Applicant's recitation of services is unrestricted and covers all types of restaurants, including high-end restaurants, we consider them.

[148] Compare *Couch/Braunsdorf Affinity, Inc. v. 12 Interactive, LLC*, 110 USPQ2d 1458, 1479 (TTAB 2014) (inquiries to company whether other company that issued coupons was the same company is not actual confusion evidence); *Marshall Field & Co. v. Mrs. Fields Cookies*, 25 USPQ2d 1321, 1334 (TTAB 1992) (inquiries of affiliation not actual confusion); *Electronic Water Conditioners, Inc. v. Turbomag Corp.*, 221 USPQ 162, 164 (TTAB 1984) ("That questions have been raised as to the relationship between firms is not evidence of actual confusion of their trademarks.") (citations omitted); *Toys "R" Us, Inc. v. Lamps R Us*, 219 USPQ 340, 345-46 (TTAB 1983) (of such inquiries, the Board said "we do not find that the evidence has much probative value on the issue of likelihood of confusion"); with *First Int'l Servs. Corp. v. Chuckles Inc.*, 5 USPQ2d 1628, 1634 (TTAB 1988) (where an opposer's franchisee, presumably a sophisticated businessperson familiar with the opposer's business, made such an inquiry, it was more probative).

Concurrent Use No. 94002242

(5)   <u>Number and nature of similar marks in the market</u>.

No party has expressly argued that the designation DELMONICO is commercially "weak" as a result of widespread third-party use. However, there is evidence in the record of the existence of a few third-party food service establishments that operate under the mark DELMONICO. A "Delmonico Gourmet Deli" apparently has or had two locations in Manhattan. Turcinovic 126:14, 182 TTABVUE 129; Licul 115:17-21, 190 TTABVUE 101. A news article from 2004 discusses a restaurant called "Delmonico's Steakhouse" in Independence, OH.[149] Mr. Lagasse mentioned a Delmonico Restaurant on Lucinda Boulevard in Los Angeles.[150] There is reference to a "(former) Delmonico Hotel" in New York City.[151]

The information of record regarding these third-party uses is scant, and we find it insufficient to indicate any meaningful commercial "weakness" in the designation DELMONICO.

VI.   <u>Conclusion</u>.

The issuance of a concurrent use registration is authorized by Section 2(d) of the Trademark Act where it is determined that specific "conditions and limitations" applicable to the use of the mark and the services for which it is used would be sufficient to render confusion, mistake, or deception unlikely. Applicant, in its application, has requested that conditions and limitations be applied only to its

---

[149] "Retro In All The Right Ways," <u>Restaurant Hospitality</u>, November 2004, p. 19ff., Wade, Sr. discovery dep., Emeril Ex. 13, OL's notice of reliance Ex. N, 74 TTABVUE 47-49.

[150] Lagasse discovery dep. 105:24-25, OL's notice of reliance, Ex. M, 73 TTABVUE 232.

[151] OL's response to Interrogatory no. 12(a)(4) of EFOL's first set of interrogatories, EFOL's seventh notice of reliance, Ex. A, 98 TTABVUE 9-10.

Concurrent Use No. 94002242

geographic territory of use. Inasmuch as the parties to this proceeding have fully litigated the issue of geographic territories, we have considered not only the territorial restriction that Applicant proposes for itself in its application, but also whether any other relevant territorial restriction would be sufficient to avoid likely confusion.

The record shows that the reputation of EFOL's DELMONICO mark reaches most geographic regions of the United States, including the state of New York. EFOL's DELMONICO restaurants have been advertised and promoted through national print and television outlets and have attracted notice in news publications originating in many states, including New York. Substantial percentages of the restaurants' customers have addresses in New York. Under such circumstances, the environs of upstate New York are not so remote that customers would be insulated from the reputation of EFOL's restaurants. Although Applicant has argued that EFOL's promotional channels, such as The Food Network, do not reach every geographic area of upstate New York, there is evidence that they are sufficiently pervasive to have reached Applicant's own personnel and business contacts, *i.e.,* Mr. O'Brien and Mr. Moran, who were aware of Mr. Lagasse's use of the BAM! designation.

OL too has demonstrated that its DELMONICO'S mark has a fairly widespread reputation, and that its reputation is particularly strong in New York City. We find it likely that the reputation of OL's restaurant could easily travel between New

Concurrent Use No. 94002242

York City (the state's center of finance and commerce) and Albany (the center of state government).

We do not foreclose the possibility that restaurants of substantially different character could coexist without confusion in separate geographic territories, or that certain conditions and limitations applied to the nature of Applicant's services and mode of use of its mark might, in addition to geographic restrictions, suffice to render confusion unlikely, as OL and EFOL have acknowledged in regard to certain third-party uses that do not cause them concern. However, Applicant has made no proposals as to such conditions and limitations and they have not been litigated.[152] Rather, the registration that Applicant seeks would apply to "restaurants" of all types, marketed in all manners normal for such services, and the registration's effectiveness would subsist even if Applicant were to substantially change the character of its restaurants (for example, by offering *haute cuisine* at higher prices).

Considering the geographic scope of the reputations of EFOL's Delmonico restaurants and OL's Delmonico's restaurant, we find that even if Applicant's

---

[152] We note 37 C.F.R. § 2.133(b), which provides, "If, in an inter partes proceeding, the Trademark Trial and Appeal Board finds that a party whose application or registration is the subject of the proceeding is not entitled to registration in the absence of a specific restriction to the application or registration, the Board will allow the party time in which to file a motion that the application or registration be amended to conform to the findings of the Board, failing which judgment will be entered against the party." In this case, no "specific restriction" was proposed or tried as to which the Board could make a finding. Accordingly, it is not appropriate to allow Applicant time in which to move for an amendment to its application. In the case of an opposed application, it has been Board policy to allow such time to amend only where the anticipated amendment "is within the scope of the notice given to plaintiff by defendant, or was tried with the express or implied consent of plaintiff ...." TBMP § 514.01; *see also Embarcadero Technologies Inc. v. RStudio Inc.*, 105 USPQ2d 1825 (TTAB 2013) (discussing amendment under Section 18 of the Trademark Act; 15 U.S.C. § 1068).

Concurrent Use No. 94002242

territory were limited to the immediate environs of Syracuse, Albany, Rochester, and Utica, there would be a likelihood of confusion arising from the concurrent use by the parties of their respective marks, given the current identification of services. For that reason, Applicant has not carried its burden of proof as to the second condition precedent. We hasten to add that we are making a determination of *registrability*, a determination that, in some regards, does not take into consideration all of the current market realities of Applicant's business, such as its current limitation to informal, moderately priced restaurant services. Our decision in this proceeding does not affect Applicant's right to continue to do business under its mark as it currently does.

We find that Applicant has not demonstrated its entitlement to a concurrent use registration for the territory it seeks, or even the territory of its current use.

*Decision:* The concurrent use proceeding is dismissed and registration is refused to Applicant.

United States Court of Appeals

for the Federal Circuit

## CERTIFICATE OF SERVICE

Counsel Press was retained by THE LAW OFFICE OF ROBERT E. PURCELL PLLC, Attorneys for Appellant to print this document.  I am an employee of Counsel Press.

On **December 11, 2015**, Counsel for Appellant has authorized me to electronically file the foregoing **Brief of Appellant** with the Clerk of Court using the CM/ECF System.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Robyn Cocho
Robyn Cocho

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C)(i), I hereby certify that this brief is proportionately spaced; uses a Roman- style, serif typeface (Century Schoolbook) of 14-point; and contains 6,998 **words**, exclusive of the material not counted under Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

/s/Robert E. Purcell
Robert E. Purcell
*Counsel for Appellant*