**15-1939**

IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

◆◆

SOUTHWESTERN MANAGEMENT, INC.,

*Appellant,*

— v. —

OCINOMLED, LTD., EMERIL'S FOOD OF LOVE PRODUCTIONS, LLC,

*Appellees.*

ON APPEAL FROM THE UNITED STATES
PATENT AND TRADEMARK OFFICE

## BRIEF FOR APPELLEE OCINOMLED, LTD.

DICKERSON MARTIN DOWNING
LAW OFFICES OF DICKERSON M. DOWNING
243 Tresser Boulevard, 17th Floor
Stamford, Connecticut 06901
(203) 355-3620

*Attorneys for Appellee Ocinomled, Ltd.*

## <u>CERTIFICATE OF INTEREST</u>
## <u>AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Federal Circuit Rule 47.4, Dickerson M. Downing, counsel for Appellee Ocinomled Ltd., certifies the following:

1.   The full name of the only party or amicus I represent in this proceeding is Appellee Ocinomled, Ltd.

2.   Ocinomled, Ltd. is the real party in interest.

3.   *Corporate Disclosure Statement*: Ocinomled, Ltd. Does not have any parent companies and no corporation owns ten or more percent of its stock.

4.   The names of all law firms and the partners or associates that appeared for Ocinomled, Ltd. in the lower tribunal, the Trademark Trial and Appeal Board or are expected to appear in this Court are:

Dickerson M. Downing, formerly with the law firm of Crowell and Moring LLP and currently with Law Offices of Dickerson M. Downing, represented Ocinomled before the Trademark Trial and Appeal Board will represent Ocinomled before this Court.

Although not currently involved in this matter, the following attorneys have appeared for Ocinomled, while employed by the law firm of Crowell & Moring in the Trademark Trial and Appeal Board proceeding:   Honor

i

Costello and Preetha Chakrabarti of the law firm of Crowell & Moring LLP

and Julia K. Smith, formerly of the law firm of Crowell & Moring and

currently with Sikorsky Aircraft Corporation.

Dated:  Stamford, Connecticut
January 27, 2016                      /s/_____
                                     Dickerson M. Downing
                                     Law Offices of Dickerson M. Downing
                                     243 Tresser Boulevard
                                     Stamford, CT 06901
                                     ddowning@downingip.com
                                     (203) 355-3620
                                     *Counsel for Appellee Ocinomled, Ltd.*

# TABLE OF CONTENTS

PAGE

CERTIFICATE OF INTEREST AND CORPORATE DISCLOSURE
  STATEMENT................................................................ i

TABLE OF AUTHORITIES ................................................ v

STATEMENT OF RELATED CASES ..................................... viii

STATEMENT OF THE CASE .............................................. 1

STATEMENT OF FACTS .................................................. 2

   A. Use by Southwestern of the DELMONICO'S Mark ............. 2

   B. Use by Ocinomled of the DELMONICO'S Mark ................ 5

   C. Other Factors Relating to Likelihood of Confusion.............. 10

SUMMARY OF THE ARGUMENT ....................................... 12

   A. The Board Applied the Proper Legal Standard ................... 12

   B. The Board Correctly Applied the Proper Legal Standard ....... 13

   C. The Board Did Not Disobey the Statutory Mandate of
      15 U.S.C. § 1067 ..................................................... 13

   D. The Board Correctly Decided the Relevant Evidentiary Issues. 14

ARGUMENT ................................................................. 14

   A. Standard of Review ................................................. 14

   B. The Board Applied the Correct Legal Standard .................. 15

      1. The Appeal Is Based on an Incorrect Premise ............... 15

PAGE

    2.  The *DuPont* Factors Apply to Concurrent Use
       Proceedings ................................................... 16

    3.  *Beatrice Foods* Did Not Replace the *DuPont* Factors....... 18

C.  The Board Correctly Applied the Proper Standard to
    Conclude Southwestern Was Not Entitled to a Concurrent
    Use Registration................................................... 21

    1.  The Board Correctly Applied the *DuPont* Factors........... 21

    2.  The Other Authority On Which Southwestern Purports
       to Rely Is Not Controlling ..................................... 28

D.  The Board Did Not Disobey the Statutory Mandate of
    15 U.S.C. § 1067 ................................................... 38

E.  The Board Correctly Decided the Evidentiary Issues............ 39

CONCLUSION................................................................ 41

CERTIFICATE OF COMPLIANCE........................................ 42

# TABLE OF AUTHORITIES

PAGE(S)

## Cases

*America's Best Franchising Inc. v. Abbott*,
106 USPQ2d 1540 (TTAB 2013) ............................. 19, 21, 32, 33

*In Re Beatrice Foods Co.*,
429 F.2d 466 (CCPA 1970)............................................*passim*

*Boi Na Braza, LLC v. Terra Sul Corp.*,
110 USPQ2d 1386 (TTAB 2014) ............................. 18, 31, 32, 33

*Brennan's, Inc. v. Brennan's Rest., LLC*,
360 F.3d 125 (2d Cir. 2004)............................................ 36

*Burger King of Florida, Inc. v. Hoots*,
403 F.2d 904 (7th Cir. 1968)........................................... 35

*Carefirst of Maryland, Inc. v. FirstHealth of the Carolinas, Inc.*,
77 USPQ2d 1492 (TTAB 2005), *affd.*, *FirstHealth of Carolinas v. Carefirst of Maryland, Inc.*, 479 F.3d 825 (Fed. Cir. 2007)........ 24, 25

*Consol. Edison Co. v. N.L.R.B.*,
305 U.S. 197 (1938).................................................... 15

*In re E. I. du Pont de Nemours & Co.*,
476 F.2d 1357 (CCPA 1973) .................................... 12, 17, 26

*Hana Financial, Inc. v. Hana Bank*,
200 U.S. 321, 135 S. Ct. 907 (2015).................................. 39

*Holiday Inns, Inc. v. Holiday Inn*,
364 F. Supp. 775 (D.S.C. 1973),
*aff'd*, 182 U.S.P.Q. 129 (4th Cir. 1974) .............................. 35

*Jack Wolfskin Ausrustung Fur Draussen GmbH v. New Millennium Sports, S.L.U.*,
797 F.3d 1363 (Fed. Cir. 2015) ...................................... 14

PAGE(S)

*Juice Generation, Inc. v. GS Enterprises LLC*,
    794 F.3d 1334 (Fed. Cir. 2015) ..................................... 14

*In re Majestic Distilling Company, Inc.*
    315 F.3d 1311 (Fed. Cir. 2003) ................................. 15, 26

*Metro Traffic Control, Inc., v. Shadow Network Inc.*,
    104 F.3d 336 (Fed. Cir. 1997)....................................... 39

*Noah's, Inc. v. Nark, Inc.*,
    560 F. Supp. 1253 (E.D. Mo. 1983),
    *aff'd* 728 F.2d 410 (8th Cir. 1984)................................. 34

*Palm Bay Imports Inc. v. Veuve Clicquot*
    *Ponsardin Maison Fondee En 1772*,
    396 F.3d 1369 (Fed Cir 2005) ............................. 17, 24, 25

*Pinocchio's Pizza Inc. v. Sandra Inc.*,
    11 USPQ2d 1227 (TTAB 1989)............................... 29, 34

*Pro-Cuts v. Schilz-Price Enterprises Inc.*,
    27 USPQ2d 1224 (TTAB 1993)...................................... 39

*Recot, Inc. v. M.C. Becton*,
    214 F.3d 1322 1327 (Fed.Cir.2000) ................................ 25

*Rotec Indus., Inc. v. Mitsubishi Corp.*,
    215 F.3d 1246 (Fed. Cir. 2000) ..................................... 15

*Southwestern Management, Inc. v. Ocinomled, Ltd.*
    *and Emeril's Food of Love Productions, LLC*,
    115 USPQ2d 1007 (TTAB 2015) ..................................... 1

*StonCor Grp., Inc. v. Specialty Coatings, Inc.*,
    759 F.3d 1327 (Fed. Cir. 2014) ................................. 14, 17

*Turdin v. Trilobite, Ltd*,
    109 USPQ2d 1473 (TTAB 2014) ............................. 12, 18, 21

*Weider Publications, LLC v. D & D Beauty Care Company, LLC*,
    109 USPQ2d 1347 (TTAB 2014) ..................................... 25

PAGE(S)

*Weiner King, Inc. v. Wiener King Corp.*,
   615 F.2d 512 (CCPA 1980)..........................................*passim*

## Statutes, Rules and Regulations

37 C.F.R. § 2.99(e)........................................................   21

37 C.F.R. § 2.122(e) .....................................................   39

15 U.S.C. § 1052(d).....................................................*passim*

15 U.S.C. § 1057(c).......................................................   29

15 U.S.C. § 1067 ....................................................   13, 38

15 U.S.C. § 1072 ........................................................   30

## STATEMENT OF RELATED CASES

There has been no prior appeal, before this Court or any other court of appeals, from the proceeding below in the Trademark Trial and Appeal Board.  Appellee Ocinomled, Ltd. ("Ocinomled") is not aware of any cases pending in this Court or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

Although Ocinomled does not believe it will affect the decision of this Court, as it does not involve issues which the Board appears to have found to be meaningful in rendering the underlying decision, in the interest of full disclosure, Ocinomled notifies this Court of a case filed on December 16, 2015 in the United States District Court for the Southern District of New York entitled *Ocinomled Ltd. v. Five "M" Corp et al*, 1:15-cv-09805-GHW (SDNY) that could possibly affect this Court's decision.

## STATEMENT OF THE CASE

The "Statement of the Case" submitted by Appellant Southwestern Management, Inc. ("Southwestern") does not include a case citation. Appellee Ocinomled submits the following:

On June 11, 2015, the Trademark Trial and Appeal Board ("TTAB") issued a final decision finding Applicant Southwestern was not entitled to a restricted concurrent use registration for DELMONICO's for "restaurant services", pursuant to 15 USC 1052(d), because the registration sought would create a likelihood of confusion between the Southwestern DELMONICO'S mark and the essentially identical marks used by excepted users/appellees Ocinomled and Emeril's Food of Love Production, LLC ("Emeril's").  The Board found Southwestern had not demonstrated its entitlement to a concurrent use registration for the territory it seeks as well as its territory of its current use. *Southwestern Management, Inc. v. Ocinomled, Ltd. and Emeril's Food of Love Productions, LLC,* 115 USPQ2d 1007 (TTAB 2015) (Concurrent Use Proceeding No. 94002242).

Ocinomled further notes that it does not adopt the second and third paragraphs of Southwestern's "Statement of the Case" which consists entirely of erroneous legal arguments.

In this Brief, Ocinomled will use "Board" to refer to the TTAB panel that rendered the decision below and "TTAB" to refer to the TTAB in general. Ocinomled will identify parts of the record on appeal as (A__) and pages in the Southwestern Brief as ("SW__).

## STATEMENT OF FACTS

### A.    Use by Southwestern of the DELMONICO'S Mark

The Southwestern application seeks to register DELMONICO'S for "restaurant services" in plain block print. (A68)  In the actual marketplace, however, Southwestern "normally" uses the full name DELMONICO'S ITALIAN STEAKHOUSE where possible. (A447-448) This includes use on its website (A4565) business cards (A4558-4559), newspaper advertising (A4567-4568), billboards (A4527-4530) and all but one of its restaurant signs (where the full name is not used because of size considerations.) (A4574-4575; A4655-4658)

As of the close of the Rebuttal Testimony period, Southwestern operated four DELMONICO'S ITALIAN STEAKHOUSE restaurants in upstate New York[1].  The restaurants have the same menu and décor with the use of caricatures of being the dominant décor item. The cover of the menu depicts caricatures of Frank Sinatra, Dean Martin and Sammy Davis.  (A4562-4563; See e.g. 4908-4909)   Frank Sinatra is an important part of the overall theme of the restaurant. (A4522)    The servers

---

[1] Southwestern claims to have subsequently opened a restaurant in Orlando. (SW5) That claim should not be considered as it involves facts outside the record.

wear uniforms which for the men includes a red mock turtleneck and black pants and for the women includes a black skirt and vest and and white blouse and a fedora type hat. (A4532)    The restaurant tables typically are hard wood with no tablecloth. (A4588) Some representative examples of advertising and other related materials are shown in the Appendix at A4898 (Advertising), A4900 (Business Card) and A4911 and A4917-4920 (Website).    The advertising depicted below is from Southwestern Trial Exhibit 4 (A4893):



At the end of the Testimony Period, the prices of the Main Courses at the restaurants ranged from approximately $11.99 to $19.99. (A4908-4910) John Wade Sr., a principal of Southwestern, believes the food prices at the restaurants are about a third of that at the Ocinomled DELMONICO'S and Emeril's DELMONICO restaurants. (A439)

Southwestern presented testimony that the first DELMONICO'S ITALIAN STEAKHOUSE restaurant was opened to the public in Syracuse on Saturday, May 16, 1998 following a "dry run" for non-paying diners the day before. (A3725; A3752-A3753; A4521-24) There was no publicity for the opening. (A4659)

Southwestern does not claim, nor is there any evidence to suggest, that its customers come from outside of the immediate area of the restaurants. One Southwestern district manager testified probably 90 to 95% of the customers come from within 20 miles of each restaurant. (A3756-3757)  Mr. Wade testified that he considered the geographic operating area for each restaurant to be within thirty miles of the restaurant location.  (A385-386)  Southwestern does not claim to advertise, nor is there any evidence of any advertising for the restaurants, outside of the immediate regions of Syracuse, Rochester, Albany and Utica. Mr. Wade said he considered "our area" to be "upstate New York."  (A384-385)  The Southwestern advertising appears to be entirely local.

Southwestern does not claim, nor is there any evidence to suggest, that its DELMONICO'S ITALIAN STEAKHOUSE restaurants have achieved any renown outside possibly of the areas in upstate New York in which they are located. Mr. Wade acknowledged the restaurants were not well-known in cities such as Philadelphia, Chicago and Los Angeles.  (A390-391)

### B.     Use by Ocinomled of the DELMONICO'S Mark

The Ocinomled DELMONICO'S restaurant in New York City is a steak-driven restaurant that features high quality fare including many of the classic dishes that were originally created at the historic DELMONICO'S restaurant that operated in the past at the same location on Beaver Street. The ambiance is classic and upscale. (A5156; A5159)   In October of 1998, *The New York Times* wrote "[a]n American icon [DELMONICO'S] has been restored to its former glory" and described the restaurant as "[o]pulant old-fashioned and dignified" where "the huge rooms are rich with stained wood and soft upholstery, and the tables are swathed in oceans of white linen." (A532) The cost of a delmonico's steak, during the relevant period, was $44. (A5126-5127; A5079)

The Ocinomled DELMONICO'S restaurant has been the subject of extensive press coverage including in *The New York Times, The Wall Street Journal (On-line Version[2]), Esquire (On-Line Version) New York Post[3], Financial Times, Time (On-line Version), Bloomberg Businessweek (On-line Version).* (See e.g. A530-552; A554-560; A5473) The Ocinomled DELMONICO'S restaurant has been referred to or featured on television shows including the nationally televised shows *Live with*

---

[2] The reference to "online version" does not necessarily mean it did not appear in the print version but only that the evidence in the Record consists of a version obtained from the Internet.

[3] The entire article entitled "The Five Stages of Wall Street Grief" (A535-539) that appeared in the *New York Post* has been included but Ocinomled directs the Court to the DELMONICO'S reference on A536.

*Regis and Kelly* (A5568), *Saturday Night Live* (A5589-5590)*, Rachel Ray Show* (A5375) and *Unwrapped* (A5567) and well as on *Good Morning America* and television shows in the New York metropolitan area. (See Testimony at A5245-5254, A5262-5263)

Ocinomled's advertising and promotional activities vary over time but has included advertising in *The Wall Street Journal,* the *New York Daily News,* the *New York Post* and the *New York Law Journal*. (A5681-5682)

The Ocinomled DELMONICO'S restaurant has received favorable reviews in *The New York Times* (A5473) an*d Time Out New York* (A5490-5491) and favorable ratings from users or readers of *Opentable.com* (A5461-5472) *Zagat* (A5475-5484; 5492), *Gayot* (A5485-5496) and *New York Magazine* (A5487-5488) (See A5209-5217.) Some of the reviews refer to the restaurant as an "institution" (A5492), an "icon" (A5492) and "historic" (A5468). During the relevant period, the restaurant won awards from *Wine Spectator Magazine* for four years in a row.  (A5196-5198)

As the Board found (A19), the press coverage for the restaurant often associates the restaurant with clientele from the Wall Street area with expense accounts. (A5572, A5581, A5584, A5589-5590; See testimony at A5258-5264. See also A530-532, 535-538, 540-542)

Approximately 200-250 people dine at the Ocinomled DELMONICO'S restaurant each day.  (A5169)  The Ocinomled DELMONICO'S restaurant has been

visited by a number of celebrities, including Denzel Washington, Halle Berry, Tyra Banks, Harvey Keitel, Bruce Willis, Matt Dillon and Hillary Clinton. (A5087) The undisputed testimony of Ocinomled's witnesses indicates that the customers of the restaurant come not just from the New York metropolitan area but also includes tourists and businessmen doing business in the Wall Street area who come from all over the United States and the world. (A5089; A5170) Milan Licul, a principal of Ocinomled, estimated forty percent of the Ocinomled DELMONICO'S customers come from outside of the New York area. (A5680-5681)

Ocinomled does not contend it has a legal chain of title dating back to the historic DELMONICO'S restaurant. However, Ocinomled has worked to recreate the ambiance and menu of that historic restaurant. (A5698) Some of the press coverage evokes the historic restaurant. An article from the online version of *Esquire* Magazine, as posted on June 14, 2010, entitled *America's Five Best Restaurants Older Than 100,* lists DELMONICO'S New York as first on the list. The article describes the history of the DELMONICO'S restaurant and discusses some of the changes that have taken place while concluding "The Beaver Street restaurant, with its marble portals from Pompeii, is still going strong." (A557-558) An article in the *Financial Times* in 2008 refers to the restaurant as "Delmonico's, the 181-year old fine dining restaurant…" and a 2009 article in *Time (On-line Version)* describes the the restaurant as an "170 year old financial district

7

institution." (A540-546)    *New York Magazine* referred to the Ocinomled DELMONICO'S restaurant as "this venerable Wall Street steakhouse." (A5487) An article published in 2004 in an Ohio magazine, discussing a new local restaurant called "Delmonico's Steakhouse", acknowledges: "Even the restaurant's name was an interesting choice, because it comes with a lot of built-in brand equity. Still going strong in New York City, the original Delmonico's is synonymous with the term 'steakhouse' for many people, even those who may have never eaten there." (A464-466)

Ocinomled purchased the New York DELMONICO'S restaurant from the Cibe Beaver LLC (sometimes referred to as the Bice Group) in September of 1999. The "Notification of Sales Transfer," dated September 3, 1999 (A5846), indicated the parties allocated $605,000 to intangible property and goodwill. Mr. Licul, who signed the document on behalf of Ocinomled, testified the amount reflected payment for the DELMONICO'S name. (A5644-5649) At the time of the purchase, the DELMONICO'S restaurant was open for business. (A5622-5623; A5650) Ocinomled closed the restaurant for a short period and re-opened it on approximately September 20, 1999. (A5650-5651)

Although no one at Ocinomled claims to have specific knowledge of the exact date Cibe Beaver first opened the restaurant, Mr. Licul testified that he believed it opened "at the end of April or beginning of May." [1998] (A5623) The opening

8

was reported in the press in May of 1998.  There was other press coverage in 1998 as well.  For example:

- *Time Out New York* – May 7-14, 1998: Article entitled "Just Opened," notes the restaurant "will reopen" on "Monday". (A523)

- *The New York Times* – Wednesday, May 13, 1998:  Article entitled "Off the Menu – A New Delmonico's" describes the opening of the restaurant on the prior "Monday" (May 11, 1998) and states "Delmonico's, possibly the most famous name in American restaurant history, is once again in the news" (A524-526)

- *The New York Times* – June 5, 1998: Article entitled "Diner's Journal" reviews the food at the restaurant and states "Delmonico's, in the financial district, has a proud history, and it looks the part. … [I]t would be easy to believe the restaurant had been operating without interruption since the turn of the century …" (A527-529)

- *The New York Times* – October 14, 1998: Article entitled "Restaurants: In A Steak Palace, A Timely Turn to Pasta," states the restaurant opened "last spring."  (A530-532)

The record also includes a Certificate of Occupancy for the location at 56 Beaver Street dated March 31, 1998 (A5847-5848) that Mr. Licul authenticated. (A5651-5654)

As noted, the opening of the restaurant was reported on in the press including *The New York Times*. In addition to the other coverage discussed earlier, the restaurant is also the subject of a book entitled "Dining at Delmonico's" (A5357) that is sold online at the Ocinomled DELMONICO'S website as well as in bookstores and online booksellers such as Barnes and Noble and Amazon.  (See Testimony at A5175-5177.)

### C.    Other Factors Relating to Likelihood of Confusion

John Wade, Sr. a principal of Southwestern, testified he believed there was no likelihood of confusion between the Southwestern DELMONICO'S ITALIAN STEAKHOUSE restaurants and the Emeril's DELMONICO restaurants due, in part, to the difference in prices and use of ITALIAN STEAKHOUSE:

> Q. [By Deborah Squiers counsel for Emeril's]    So, as a business person, can you tell me the reasons as to why your Delmonico's restaurants would not be confused with Mr. Lagasse's two Delmonico restaurants?
>
> A…I don't think that from--based upon the menu that I have seen, someone going out for a $20 meal [at Southwestern] is going to go to Emeril's for a $60 meal; someone is going to go to John Wades Delmonico's Italian Steakhouse. *Plus it does say Italian Steakhouse*. It's not the same. (A400-401) (Italics Added)

Mr. Wade went on to testify he could envision a situation where confusion could occur if the styles of the two restaurants were not so different:

10

Q. [By Ms. Squiers] You previously testified that with respect to Mr. Lagasse's Delmonico and your Delmonico's restaurant that the style is different; correct?

A.    Yes.

Q.   Can you envision a circumstance where the use of the marks Delmonico's on your part, and Delmonico on his [Emeril's] part could be confused?

A.    I-- probably close to it, knowing in restaurants there is a lot of difference, but I can see when you see two names somebody might be confused. It certainly isn't causing any problem now. I doubt it's causing him any problem.

Q. And could it be confused because of the similarity of the name?

A.    *Yes.*   (A401) (Italics Added)

Similarly, when asked why he was not concerned the DELMONICO'S restaurant in New York, Mr. Wade responded, in part, it was a "[t]otally different kind of restaurant." (A429)

In response to a question as to why he did not believe there would be confusion between the Southwestern DELMONICO'S restaurants and a DELMONICO'S restaurant in the Cleveland area, Mr. Wade testified the Cleveland DELMONICO'S is "a different type of restaurant" because "[i]t's more high-end like I assume the New York City is, and I assume Emeril's is." (A396-397) Mr. Wade also testified that if he had heard of a hypothetical Delmonico's restaurant in Boston, he would want to see if they use ITALIAN STEAKHOUSE and he would

11

want to know if the "concept" of the restaurant were different in which case it "wouldn't be much of a problem". If the concept was similar, it could be "more of a problem". (A383-383)

## SUMMARY OF THE ARGUMENT

### A. The Board Applied the Proper Legal Standard

This appeal is premised on the demonstrably incorrect argument that the Board erred by applying what are known as the *DuPont*[4] factors to determine whether the concurrent use registration sought by Southwestern would create a likelihood of confusion. The *DuPont* factors have been used by this Court and the TTAB for over forty years to determine whether a likelihood of confusion exists in all types of trademark cases. This includes concurrent use trademark cases. See e.g. *Turdin v. Trilobite, Ltd,* 109 USPQ2d 1473, 1481 (TTAB 2014).

Southwestern argues the Board should have applied a different "standard of policy" for concurrent use cases as purportedly established by a predecessor to this Court in *In Re Beatrice Foods Co*., 429 F.2d 466 (CCPA 1970) – one that places great weight on factors such as which party was the first to apply for registration and little weight on the *DuPont* factors. Southwestern is wrong. As the *Beatrice Foods* court found, the "touchstone" of any concurrent use determination *"is the requirement that there be no likelihood of confusion, mistake or deception* in the

---

[4] See *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 1361 (CCPA 1973)

market place … resulting from the continued concurrent use of the trademark" *Id.* at 473.   (Italics Added) The factors Southwestern describes as a "standard of policy" are actually criteria which are helpful in resolving questions regarding the allocation of territorial limitations in concurrent use registrations but only if if there is no likelihood of confusion. The Board did review and consider the *Beatrice Foods* criteria but, in light of the its finding that a likelihood of confusion existed, the Board correctly viewed these criteria as "very much subordinate" to a determination of likelihood of confusion. (A37)

## B. The Board Correctly Applied the Proper Legal Standard

Substantial evidence supports the Board's findings that the virtually nationwide registration by Southwestern of DELMONICO'S in block print for unrestricted "restaurant services" would be likely to cause confusion with one or both of the nearly identical marks owned by Ocinomled or Emeril's particularly as both of those parties have demonstrated a reputation for their respective marks outside of the limited geographic areas in which Southwestern sought to limit them.

## C. The Board Did Not Disobey the Statutory Mandate of 15 U.S.C. § 1067

The Board did not disobey the purported mandate of 15 U.S.C. § 1067 by not deciding the respective registration rights of all three parties because the Board did not have any jurisdiction over the applications filed by Ocinomled and Emeril's

both of which have been suspended by the United States Patent and Trademark Office ("USPTO") pending the disposition of this proceeding. The Southwestern application is the only "involved" application in this proceeding.

### D. The Board Correctly Decided the Relevant Evidentiary Issues

The Board correctly decided all of the evidentiary issues raised by Southwestern, as they pertain to Ocinomled, and gave proper weight to the evidence, which included newspaper reports and business records, in determining that a predecessor in interest to Ocinomled opened the DELMONICO'S restaurant in New York city no later than May 13, 1998.

### ARGUMENT

#### A. Standard of Review

The Board's ultimate conclusion regarding likelihood of confusion, under 15 U.S.C. § 1052(d), is a question of law with the underlying factual findings made pursuant to the *DuPont* factors. This Court reviews the TTAB's factual findings on each factor for substantial evidence and its legal conclusion of likelihood of confusion *de novo*. *StonCor Grp., Inc. v. Specialty Coatings, Inc.*, 759 F.3d 1327, 1331 (Fed. Cir. 2014). *See also Juice Generation, Inc. v. GS Enterprises LLC*, 794 F.3d 1334, 1338 (Fed. Cir. 2015); *Jack Wolfskin Ausrustung Fur Draussen GmbH v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 1370 (Fed. Cir. 2015). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). The possibility that inconsistent conclusions may be drawn from the same record does not render a Board's finding unsupported by substantial evidence. See *In re Majestic Distilling Company, Inc.* 315 F.3d 1311, 1314 (Fed. Cir. 2003).

This Court reviews evidentiary rulings under an abuse of discretion standard *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1256 (Fed. Cir. 2000).

The Standard of Review listed by Southwestern for the purported issue of a "different set of facts" is not relevant in this appeal as that issue, as defined in the decision cited, is not raised in this appeal. (SW19)

## B. The Board Applied the Correct Legal Standard

### 1. The Appeal Is Based on an Incorrect Premise

This appeal is based on the indisputably incorrect contention by Southwestern that the Board applied the "wrong standard." Southwestern argues that although the *DuPont* factors "normally" apply in determining rights to federal trademark registration, they do not apply in concurrent use cases. Instead, Southwestern contends, that this Court has recognized, in accord with the decision of *In re Beatrice Foods Co.*, 429 F.2d 466 (CCPA 1970) and other decisions, that a different "standard of policy" for determining a likelihood of confusion in

allocating territories of concurrent use must be used – one that places "little weight" on the *DuPont* factors, some of which are claimed to be "essentially meaningless" in this context.   (SW2-3, 20) Southwestern concludes the Board errantly gave improper emphasis to the *DuPont* factors and "junked" the *Beatrice Foods* standard by finding, at A37, that "the *Beatrice Foods* standard of a policy favoring the first to register or apply for registration 'is treated as a factor that is very much subordinate to the statutory considerations of whether confusion is likely.'" (SW20)

As will be shown, Southwestern is wrong.  The *DuPont* factors do apply to concurrent use cases.  The Board did give proper deference to the criteria set forth in *Beatrice Foods* and other decisions but properly found those criteria do not apply where, as here, likelihood of confusion exists.

### 2. The *DuPont* Factors Apply to Concurrent Use Proceedings

Concurrent use proceedings are governed by Section 2(d) of the United States Trademark Act of 1946, as amended, which is commonly referred to as the "Lanham Act". (15 U.S.C. § 1052(d)).   That section provides that a concurrent use registration can only be issued if it does not create a likelihood of confusion:

> [I]f the Director determines that confusion, mistake, or deception is not likely to result from the continued use by more than one person of the same or similar marks under conditions and limitations as to the mode or place of use  of the marks or the goods on or in connection with which such marks are used,

16

> concurrent registrations may be issued to such persons when they have become entitled to use such marks as a result of the concurrent lawful use in commerce prior to (1) the earliest of the filing dates of the applications pending or of any registration issued under this chapter . . . . (Italics Added)

As the Board noted, citing *Beatrice Foods*, 429 F.2d at 471-472, there are two "conditions precedent to the issuance of concurrent registrations," specifically: (1) that the party seeking registration be entitled to use the mark in commerce, notwithstanding concurrent use by others [which is not at issue here]; and (2) that *there be no likelihood of confusion, mistake or deception in the marketplace* as to the source of the relevant goods or services resulting from the continued concurrent use of the trademark. (A26) (Italics Added).

The express purpose of the "the conditions and limitations" referenced in Section 2(d) is to prevent consumer confusion. *Weiner King, Inc. v. Wiener King Corp.*, 615 F.2d 512, 524 (CCPA 1980)

In determining whether a likelihood of confusion exists under the Lanham Act, this Court and the TTAB apply a non-exhaustive listing of thirteen considerations known as the *DuPont* factors. See e.g. *StonCor Grp,* 759 F.3d at 1331, *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 1371 (Fed Cir. 2005). The *DuPont* factors were originally articulated in 1973 by the predecessor to this Court. See *In re E. I. du Pont de*

*Nemours & Co.*, 476 F.2d 1357, 1361 (CCPA 1973). The *DuPont* factors do apply

to concurrent use trademark cases. See e.g. *Turdin,* 109 USPQ2d at 1481.

Although many TTAB and CAFC concurrent use decisions do not expressly

refer to the *DuPont* factors, that does not mean that they do not apply.   In most

concurrent use cases, the primary issue is not whether a likelihood of confusion

exists – that has often already been decided in a prior decision or agreed upon by

the parties – but rather whether a likelihood of confusion could be avoided by

geographic restrictions or other "conditions and limitations".  See e.g. *Weiner King*

615 F.2d at 521 – noting that the existence of a likelihood of confusion in that case,

in the absence of restrictions, had been established by two courts and the TTAB.

See also *Boi Na Braza, LLC v. Terra Sul Corp.*, 110 USPQ2d 1386, 1393 (TTAB

2014) – likelihood of confusion established in prior cancellation decision.  And, in

essence, that is the fundamental issue the Board did address in finding that the

territorial conditions proposed by Southwestern would not prevent a likelihood of

confusion.

### 3. *Beatrice Foods* Did Not Replace the *DuPont* Factors

The factors discussed in the *Beatrice Foods* have been described as "criteria

which are helpful in resolving" the question of the allocation of territory in a

18

concurrent use dispute.[5] *Weiner King,* 615 F2d at 523. While helpful, they do not establish a "different standard for determining a likelihood of confusion in allocating territories of concurrent use" as Southwestern incorrectly contends.  (SW3) To the contrary, the decision in *Beatrice Foods* repeatedly makes it very clear that the criteria should only be applied where there would be no resulting likelihood of confusion.  As the *Beatrice Foods* court found, the "touchstone*"* of any concurrent use determination *"is the requirement that there be no likelihood of confusion, mistake or deception* in the market place ... resulting from the continued concurrent use of the trademark" *Beatrice Foods*, 429 F.2d at 473.   Therefore, "the primary concern of the Patent Office, in determining *whether* and *to what extent registrations are to be granted*, is to be the avoidance of any likelihood of confusion." *Id.* at 474.  Accordingly, the *Beatrice Foods* court recognized, the criteria it established do not apply "to the extent that any other subsequent user, who can establish the existence of rights earlier than the prior user's application for registration, *can also prove a likelihood of confusion, mistake or deception*." *Id.* (Italics Added). It is quite clear that *Beatrice Foods* did not, as Southwestern contends, elevate issues, such as which party was the first to file, over the "touchstone" issue of likelihood of confusion.

---

[5] The *Beatrice Foods* criteria are sometimes referred to as a "presumption" that can be overcome.  See e.g. *America's Best Franchising Inc. v. Abbott*, 106 USPQ2d 1540, 1549 (TTAB 2013)

The Board reviewed the *Beatrice Foods* opinion at some length and discussed the possible application of some of the criteria to the facts present here but correctly concluded the criteria in *Beatrice Foods* did not apply where there would be a likelihood of confusion.    As the Board found in addressing the implications of the fact that Southwestern was the first to file a trademark application:

> To the extent that our principal reviewing Court and the Board [TTAB] have discussed a policy favoring the first to register or the first to apply for registration, it is treated as a factor that is *very much subordinate to the statutory considerations* at the heart of a concurrent use analysis, i.e., the determinations as to whether a party is entitled to use its mark and as to whether confusion is not likely. 15 U.S.C. § 1052(d). Any policy favoring those who apply for registration cannot, alone, automatically establish a party's entitlement to use its mark in the majority of the geographic United States if consumer confusion is likely to result, in contravention of Section 2(d). (A37) (Italics Added)

The same conclusion would apply equally to any of the other criteria listed in *Beatrice Foods*.   The Board had a statutory mandate not to issue a registration where it would result in a likelihood of confusion. As the Board correctly found, the criteria suggested in *Beatrice Foods* for allocating territory are very much subordinate to that statutory consideration. The appeal has no merit on its face.

It is possible Southwestern may have simply misunderstood the *Beatrice Foods* decision. Ocinomled respectfully submits, however, that no such misunderstanding warrants the unwarranted *ad hominem* attacks made by

Southwestern on the integrity and competence of the Board (SW 21-23) to which Ocinomled takes strong exception. Ocinomled submits that these attacks only serve to further underscore the absolute lack of merit underlying this entire appeal.

### C. The Board Correctly Applied the Proper Standard to Conclude Southwestern Was Not Entitled to a Concurrent Use Registration

1. The Board Correctly Applied the *DuPont* Factors

Southwestern, as the applicant, has the burden to establish its entitlement to a concurrent use registration. Trademark Rule 2.99(e), 37 C.F.R. § 2.99(e); *Turdin,* 109 USPQ2d at 1478. This means it has the burden of proving the registration sought will not result in a likelihood of confusion. *America's Best Franchising Inc. v. Abbott*, 106 USPQ2d 1540, 1548 (TTAB 2013) *citing Gray v. Daffy Dan's Bargaintown*, 823 F.2d 522 (Fed. Cir. 1987).

Southwestern does not ever make that argument. There is no section in its brief where Southwestern collects arguments and evidence on this most fundamental issue except to argue, incorrectly, that *Beatrice Foods* adopted entirely new likelihood of confusion standards. Southwestern makes no attempt to explain how the territorial limitations it proposes will avoid confusion. Ocinomled submits this failure, standing alone, warrants the denial of this appeal.

In any event, the factual findings of the Board were amply supported by the record and the Board's ultimate finding of a likelihood of confusion was clearly correct. In conducting this analysis, the Board was mindful that Southwestern seeks to register DELMONICO'S in block print for all "restaurant services" without any conditions or limitations except the very limited geographical allocations for a subset of the metropolitan areas of New York City, New Orleans and Las Vegas. None of the possibly distinguishing elements of the Southwestern restaurants – such as the use of the full name DELMONICO'S ITALIAN RESTAURANT and the differences in the concept, appearance and price between the Southwestern restaurants and the Ocinomled and Emeril's restaurants – are reflected in the application. In applying the *DuPont* factors under these conditions, the Board correctly found that the marks are essentially identical in appearance, sound, meaning and overall commercial impression. Because the Southwestern application was for "restaurant services" the Board correctly deemed it to include all types of restaurant services and found the channels of trade, class of customers and type of services to be the same for everyone. (A38-42; A56). As there was only "scant" evidence in the record of third party use, the Board concluded DELMONICO'S should not be considered to be weak. (A54) Southwestern does not challenge any of these findings.

As the Board noted, in a concurrent use proceeding, the fame and extent of reputation of all of the parties have a bearing on the analysis of likelihood of confusion. (A42)

With respect to Ocinomled, the Board found:

> OL [Ocinomled] has demonstrated that its DELMONICO'S mark has a fairly widespread reputation, and that its reputation is particularly strong in New York City. We find it likely that the reputation of OL's restaurant could easily travel between New York City (the state's center of finance and commerce) and Albany (the center of state government). (A55-56)

The Board also found:

> …the fact that OL operates a restaurant that emulates the historic Beaver Street restaurant and does so at the same street address clearly has generated a heightened degree of interest and excitement among the press and the public, which has redounded to the benefit of OL. At the very least, it resulted in virtually instantaneous name recognition upon the opening of OL's restaurant. (A45)

By contrast, the Board also found that "[t]he record indicates that the reputation of Applicant's restaurants is local in nature." (A42)

These findings are all well supported by the record. Indeed, Ocinomled submits the conclusions understate the scope of the reputation of the Ocinomled restaurant as reflected in the record. It was reasonable for the Board to conclude that the recognition of both the Ocinomled and Emeril's marks extended beyond the

geographic areas sought to be assigned to them by Southwestern and into the areas claimed by Southwestern.

Although Southwestern does not expressly address the *DuPont* factors, except to say they don't apply, Southwestern does argue that the Board's findings in evaluating "fame" – one of the *DuPont* factors – is flawed because, Southwestern claims, neither Ocinomled or Emeril's have proven their marks are "famous." Southwestern cites in support of this proposition the TTAB decision in *Carefirst of Maryland, Inc. v. FirstHealth of the Carolinas, Inc.*, 77 USPQ2d 1492 (TTAB 2005), *affd.*, *FirstHealth of Carolinas v. Carefirst of Maryland, Inc.*, 479 F.3d 825 (Fed. Cir. 2007) (SW 26) In that case, Opposer claimed that the registration of FIRSTCAROLINACARE would dilute and be likely to cause confusion with Opposer's mark CAREFIRST.

Southwestern's argument reflects a fundamental misunderstanding of how the "fame" factor is to be applied in a case like this one. In particular, Southwestern fails to recognize that "fame" for likelihood of confusion purposes and "fame" for dilution purposes are distinct concepts. See *Palm Bay Imports* 396 F.3d at 1371.  As this Court found in *Palm Bay Imports*, "[w]hile dilution fame is an either/or proposition — fame either does or does not exist — likelihood of confusion fame '*varies along a spectrum from very strong to very weak*.'" *Id.* at 1375 citing *In re Coors Brewing Co.* 343 F3d 1340, 1345 (Fed.Cir. 2003) (Italics Added).  The fame

factor requires an evaluation of the impact on the extent to which the degree of recognition of the marks at issue would or would not support a finding of likelihood of confusion when considered with of all of the other relevant *DuPont* factors.

Unlike dilution, fame for likelihood of confusion purposes does not require a party to show fame among every segment of the U.S. population. Rather, fame for likelihood of confusion purposes arises as long as a "significant portion of the relevant consuming public ... recognizes the mark as a source indicator." *Id*. See *Weider Publications, LLC v. D & D Beauty Care Company, LLC*, 109 USPQ2d 1347, 1354 (TTAB 2014).

In *Carefirst*, the marks – CAREFIRST and FIRSTCAROLINACARE were arguably easily distinguishable.  There was also extensive evidence of third party use of CARE and FIRST. It is submitted the Opposer had an extremely heavy burden of trying to establish its mark CAREFIRST was famous for the purposes of dilution and, otherwise sufficiently famous to play a "dominant role in the process of balancing the *DuPont* factors", in accord with *Recot, Inc. v. M.C. Becton,* 214 F.3d 1322 1327 (Fed.Cir. 2000), as would be necessary to warrant a finding of likely confusion under the circumstances. The TTAB concluded that the strength of mark CAREFIRST "favors opposer" but not to the extent that it would if the mark were

famous and otherwise found the other factors to be determinative in finding no dilution or likelihood of confusion under the circumstances.

Here the degree of recognition necessary to support the Board's finding is not as high, as virtually every relevant *DuPont* factor strongly favors a finding of a likelihood of confusion with the possible exception of the "actual confusion" and "no actual confusion" factors which may be neutral.

The only real issue here was whether the conditions and limitations set forth in the Southwestern application – limiting Ocinomled and Emeril's to subsets of the metropolitan areas of New York City, New Orleans and Las Vegas – prevented a likelihood of confusion. In evaluating the fame factor, the Board correctly found that the degree of public recognition of the Ocinomled and Emeril's marks were sufficiently strong to support a finding of likelihood of confusion when balanced with the other *DuPont* factors.

Southwestern also asserts, in an isolated statement, there has been no evidence of actual confusion involving its restaurants. (SW17) That assertion suggests the *DuPont* factor that looks to the length of time and *conditions under which* there has been concurrent use without confusion. *DuPont,* 476 F.2d at 1361-1362 ("Italics Added") See also *In re Majestic*, 315 F.3d at 1315. However, it has no relevance in this case, even if there has been no confusion, because the application seeks registration of the mark DELMONICO'S in block print for all

26

"restaurant services." The actual marketplace conditions that might mitigate against confusion – including the fact that Southwestern normally uses the full name DELMONICO'S ITALIAN STEAKHOUSE in connection with restaurants that are far lower priced and have an entirely different appearance and concept than the Ocinomled and Emeril's restaurants – are not reflected in the application. It could be said the mark shown in the Southwestern application has never really co-existed, in the real marketplace, with the Ocinomled and Emeril's marks. Accordingly, the possible absence of actual confusion is not meaningful. As John Wade Sr., a principal of Southwestern testified, in explaining why he didn't believe there would be a likelihood of confusion between his restaurant and the Emril's DELMONICO'S restaurant:

> I don't think that from--based upon the menu that I have seen, someone going out for a $20 meal [at Southwestern] is going to go to Emeril's for a $60 meal; someone is going to go to John Wades Delmonico's Italian Steakhouse. *Plus it does say Italian Steakhouse.* It's not the same. (A400-401) (Italics Added)

In the actual marketplace, as Mr. Wade states "[i]t's not the same." In the application as filed by Southwestern, it is exactly the same.

Ocinomled submits that all of the underlying significant findings made by the Board, in applying the *DuPont* factors, are well supported by the record and the

ultimate conclusion, reached by the Board, that the concurrent use registration sought by Southwestern would create a likelihood of confusion in violation of 15 USC 1052(d), notwithstanding the territorial limitations, is correct.

2. The Other Authority On Which Southwestern Purports to Rely Is Not Controlling

Instead of addressing the touchstone issue of likelihood of confusion, Southwestern argues it is entitled to benefit from certain purported presumptions found in *Beatrice Foods* and *Weiner King* and otherwise relies on rote recitations of decisions in cases involving entirely different facts. Ocinomled submits none of this is relevant because, as the Board found, Southwestern failed to demonstrate that the territorial restrictions it offered would avoid confusion. That finding should end the argument.

Nevertheless, to the extent a response might be necessary, Ocinomled responds as follows: The fundamental flaw in Southwestern's simplistic argument – in addition to the fatal flaw of failing to refute the finding with respect to the issue of likelihood of confusion – is that Southwestern never sets forth a plausible explanation or reason why it should be entitled to a virtually nationwide registration. This is particularly true in light of the undisputed fact that both Ocinomled and Emeril's have established a public recognition for their respective marks that clearly exceeds that of Southwestern.   Ocinomled believes such an extraordinary result would be unprecedented.

Southwestern fails to acknowledge that this is a very unique and complex case with facts unlike that of any other case cited by Southwestern or known to Ocinomled. It does not lend itself to a rote "by the numbers" simplistic analysis.

Southwestern argues that the mere fact it was first to file a trademark application entitles it to nationwide registration (SW12-14) but that is clearly not a supportable argument with the facts present here. In some circumstances even the first to register has been found to not be entitled to nationwide rights. See e.g. *Pinocchio's Pizza Inc. v. Sandra Inc.,* 11 USPQ2d 1227, 1229 (TTAB 1989).  In any event, Ocinomled filed its application to register DELMONICO'S (SN 76-577,253) on February 23, 2004 less than eight months later – hardly a large enough gap to award Southwestern nationwide rights.

Moreover, the mere filing of an application does not, as Southwestern contends, "freeze" the rights of all third parties pursuant to Section 7(c) of the Lanham Act. (15 U.S.C. § 1057(c)) (SW13) To the contrary, the constructive use and priority provisions of that Section are plainly "contingent on the registration of a mark on the principal register" and would not apply to Ocinomled, in any event, because Ocinomled began use of the mark long prior to the Southwestern application. (Italics Added). The relevant section is set forth below:

> c) Application to register mark considered constructive use *Contingent on the registration of a mark* on the principal register provided by this chapter, the filing of the application to register such mark shall constitute constructive use of the mark,

> conferring a right of priority, nationwide in effect, on or in connection with the goods or services specified in the registration against any other person *except for a person* whose mark has not been abandoned and *who, prior to such filing—*
> (1) *has used the mark*;
> (2) has filed an application to register the mark which is pending or has resulted in registration of the mark; … (Italics Added)

The Board believed Southwestern's argument conflates the constructive notice provision of Section 22, 15 U.S.C. § 1072, (A36) with the constructive use provision and correctly noted, that Section 22, as reproduced below, only applies to an existing registration (A36):

> *Registration of a mark* on the principal register provided by this chapter or under the Act of March 3, 1881, or the Act of February 20, 1905, shall be constructive notice of the registrant's claim of ownership thereof. (Italics Added)

Similarly, to the extent there may be a public policy favoring the first to file, that policy also should only apply after the registration issues. That was certainly the conclusion of the predecessor to this Court in the two decisions most often cited for this proposition. See *Beatrice Foods*, 429 F.2d at 474 n.13:

> [W]here the prior user does not apply for registration *before registration is granted to another*, there may be valid grounds, based on a policy of rewarding those who first seek federal registration, [by] permitting the prior registrant to retain the nationwide protection of the act restricted only by the territory of the prior user. (Italics Added)

30

*See also Weiner King,* 615 F.2d at 523-524.

More importantly, as the Board found, being the first to file is not enough to establish rights where there is a likelihood of confusion.

> Any policy favoring those who apply for registration cannot, alone, automatically establish a party's entitlement to use its mark in the majority of the geographic United States if consumer confusion is likely to result, in contravention of Section 2(d). (A37)

Southwestern also claims it was the first to use the mark but, as discussed below, the Board found that the predecessor in interest to Ocinomled opened the New York City DELMONICO'S restaurant at least two days before Southwestern opened its first restaurant (A22).[6] It is undeniable that the New York City restaurant was open for business as of June 5, 1998, when the *New York Times* reviewed the restaurant, so at most, the Southwestern priority was measured in weeks – once again hardly a reason to reward Southwestern with a nationwide registration. Many decisions have found that the first to use a mark is not entitled to nationwide rights. See e.g. the decisions in *Weiner King* and *Boi Na Braza*.

Finally, Southwestern argues it is entitled to a nationwide registration because it has expanded while Ocinomled has not. Southwestern does operate four restaurants in upstate New York, but that falls far short of the level of expansion that would be necessary to overcome the fact that none of those restaurants are as well

---

[6] The Board also found that Emeril's had priority with respect to Southwestern. Ocinomled will take no position with respect to that finding.

known as the single Ocinomled DELMONICO'S restaurant which has far higher recognition and renown. This conclusion is not altered by the fact that Southwestern may have planned to open a new restaurant in Orlando after the close of the Rebuttal Period.

Indeed, Ocinomled has been unable to locate any evidence in the record reflecting press coverage, reviews or third party references to Southwestern's restaurants at any time.

Ocinomled acknowledges there have been decisions that have been allocated concurrent use territorial rights for restaurants and hotels and similar businesses where, unlike here, it could be done without creating a likelihood of confusion. At least one decision noted that "the Board and other tribunals have often found that confusion can be avoided when restaurant services in particular are offered under identical marks but in geographically restricted territories" See *Boi Na Braza,* 110 USPQ2d at 1393.  This may be correct but it is not relevant to the facts in this case. Other decisions have noted that restaurant services (and similar services), by definition, are rendered in a specific geographic location.  See e.g. *America's Best Franchising,* 106 USPQ2d at 1550.  This too is correct in so far as it goes but it really is just a starting point for the evaluation.  As the predecessor to this Court noted, in rejecting a mechanical application of the *Beatrice Foods* criteria, "[t]he problems of concurrent use issues must ultimately be solved by a comprehensive

factual analysis, which the TTAB has both the power and the resources to make." *Weiner King,* 615 F.2d at 525.

Some restaurants, like those of Ocinomled and Emeril's have reputations that go beyond the immediate locale of the building in which they are located. Other restaurants, like those of Southwestern, do not. The actual degree of reputation and recognition of the excepted user and the geographical areas from which it draws customers is always taken into consideration in concurrent use case. In the *America's Best Franchising,* 106 USPQ2d at 1540, for example, the applicant junior user was awarded a nationwide registration, except for the State of Arizona, for a variation of the 3 PALMS mark where, unlike here, it operated at least eight hotels spread throughout the country on the East Coast, Midwest and West Coast and where, unlike here, there was no evidence that defendant's Scottsdale hotel had any reputation outside of its designated area. (The weakness of the PALMS mark – a factor also not present here – was also found to be very important. *Id.* at 1550). A similar situation is found in *Boi Na Braza,* 110 USPQ2d at 1396 where the junior user/applicant, which operated restaurants in three geographically distinct metropolitan areas of Dallas, Cincinnati and Atlanta, was granted a nationwide reputation subject to a limited registration for the states of New York and New Jersey allocated to a senior user restaurant in Newark which had not established any renown outside of that area. (The case also involved the "unusual circumstance"

that the junior user already owned an incontestable registration for a variation of the mark. *Id.* at 1394). Neither decision remotely supports the proposition that the party with the demonstrably lowest degree of public recognition of the three parties in a three party concurrent use proceeding should be given nationwide rights.

It also is also worth noting that, in both cases, the excepted users were awarded at least an entire state which is another factor which might avoid confusion because it increases the geographic separation between the parties. The same is true in *Pinocchio's Pizza* at 11 USPQ2d at 1229 where a relatively small prior user and prior registrant in Catonsville, Maryland was allocated the entire state of Maryland and a fifty-mile radius around Catonsville while nationwide registration was awarded to an expanding chain with ten restaurants in Texas. *See also Noah's, Inc. v. Nark, Inc.*, 560 F. Supp. 1253, 1260 (E.D. Mo. 1983), *aff'd* 728 F.2d 410 (8th Cir. 1984) – a decision from over thirty years ago that is somewhat difficult to understand given the paucity of supporting facts but one in which a senior user with a single restaurant in Des Moines was ultimately awarded the entire state of Iowa. (not a twenty-mile radius around Des Moines as stated by Southwestern[7]).

---

[7] Ocinomled notes that Southwestern cites the TTAB decision in this case for the proposition that the Iowa restaurant was allocated a twenty-mile radius of Des Moines without mentioning that the District Court expanded the area to include the entire state. (SW15)

But it is not possible to do that here. Southwestern has not cited any decisions, and Ocinomled is not aware of any, where a restaurant with the reputation of Ocinomled's DELMONICO'S restaurant has been limited to the narrow circle of protection that Southwestern offers.

The *Weiner King* case is sometimes cited for the proposition that confusion can often be avoided when restaurants are involved. In that decision, the predecessor to this Court largely upheld the TTAB decision finding that a then rapidly expanding and well known franchise with over 100 restaurants was entitled to a nationwide registration subject only to an area within a 15-mile radius of Flemington, New Jersey found to be the senior user's "reputation zone." *Weiner King*, 615 F2d at 526. In rendering the decision, the court agreed with the TTAB that it was "an inescapable conclusion" that, outside of the senior user's "little enclave", WIENER KING means restaurants of the junior user and to allow the senior user to step out of its trading area, would cause confusion to the purchasing public. *Weiner King* at 615 F2d at 524. Here it is Southwestern that is unknown outside of its "little enclave" of possible recognition in upstate New York.

Other decisions have also found that a rapidly expanding and well known restaurant franchise and registration owner may limit the rights of a little known senior user or innocent junior user to a very small geographic region. See e.g. *Burger King of Florida, Inc. v. Hoots*, 403 F.2d 904 (7th Cir. 1968); *Holiday Inns,*

*Inc. v. Holiday Inn*, 364 F. Supp. 775 (D.S.C. 1973), *aff'd*, 182 U.S.P.Q. 129 (4th Cir. 1974). That is not the case here. None of those users had a reputation outside of the narrow enclaves to which they were assigned and Southwestern does not own a rapidly expanding and well known franchise.

Finally, although not expressly cited by Southwestern, one of the decisions that was quoted at some length in the Southwestern Brief refers to *Brennan's, Inc. v. Brennan's Rest., LLC*, 360 F.3d 125, 134 (2d Cir. 2004). (SW16) In that decision, the court found that the owner of the BRENNAN'S restaurant in New Orleans was not entitled to preliminarily enjoin the use by use of TERRANCE BRENNAN'S SEAFOOD & CHOP HOUSE by a restaurant in New York City, in part, because of the considerable geographical separation between New Orleans and New York City. (There were other distinguishing factors involved in the decision as well including the obvious differences in the marks and the established reputation of Chef Terrance Brennan in New York.) This situation presents an entirely different scenario. In this case, a little known restaurant, whose reputation, at most, is limited to upstate New York, seeks to obtain essentially nationwide rights, including rights in many geographic locations where one or both of the other parties' restaurants are far better known and where confusion is virtually inevitable. It would be as if Terrance Brennan's New York restaurant began doing business in the suburbs of New Orleans under the BRENNAN'S name.

The area claimed by Southwestern would include the many bedroom communities of New York City that lie well outside of the arbitrary forty-mile radius of the Empire State Building. It also would include a much larger area where the readers of *The New York Times* and *The Wall Street Journal* and where viewers of *Live with Regis and Kelly*, *The Rachel Ray Show* and *Saturday Night Live* have become familiar with the Ocinomled DELMONICO'S restaurant but have never heard of DELMONICO'S ITALIAN STEAKHOUSE. It would include people from far outside of the area who have visited New York or are otherwise familiar with the restaurant.

Moreover, once a registration issues, there would be nothing to prevent Southwestern from using or licensing the use of the DELMONICO'S mark *per se* in connection with classically oriented and themed steakhouses that are in direct market proximity to Ocinomled.

Southwestern does not really dispute the fact that the Ocinomled DELMONICO'S restaurant is far better known than its own restaurants.  Instead, Southwestern argues that the existence of one or possibly two Delmonico's Gourmet Deli's in Manhattan somehow should limit the territory to which Ocinomled is entitled.  (SW29)   As the Board found, the existence of these delicatessens are not relevant because of the significant differences in the style and type of the businesses.

37

(A41) As Mr. Licul testified: "They're a deli. We are a high-end restaurant, we are white tablecloth restaurant. Two different things." (A5714)

Accordingly, Ocinomled submits none of the simplistic arguments submitted by Southwestern undermine the central findings of the Board regarding likelihood of confusion or otherwise provide any plausible justification for the essentially nationwide registration that Southwestern seeks.

### D. The Board Did Not Disobey the Statutory Mandate of 15 U.S.C. § 1067

The Board did not disobey the mandate of 15 U.S.C. §1067 by not deciding the respective registration rights of all three parties, as Southwestern now contends[8], because the Board did not have jurisdiction over the applications filed by Ocinomled and Emeril's. As the Board found, the Southwestern application is the only "involved" application seeking concurrent use registration. (A27) The unrestricted applications filed by Ocinomled and Emeril's to register DELMONICO'S and DELMONICO are in suspension, in accordance with USPTO procedure, pending disposition of the Southwestern application. *See* TBMP § 1104.

---

[8] Southwestern's current argument is directly contrary to the argument it made to the Board in successfully opposing the filing by Ocinomled and Emeril's of rebuttal briefs. As Southwestern argued, citing TBMP § 1104, "[t]he specific territorial rights to which any common law users [Ocinomled and Emeril's] are entitled are not before the Board except to the extent that their rights are limited by the territorial rights to which applicant proves entitlement." See TTABVIEW 165, Page 3 n. 1, Proceeding No. 91199784

The Board had no jurisdiction over either application. *See Pro-Cuts v. Schilz-Price Enterprises Inc.*, 27 USPQ2d 1224, 1226 (TTAB 1993).

### E. The Board Correctly Decided the Evidentiary Issues

It is well established that a party may rely on use of the mark by its predecessor-in-interest to establish its first use date. *See Metro Traffic Control, Inc., v. Shadow Network Inc.*, 104 F.3d 336, (Fed. Cir. 1997). Southwestern has objected to the finding of the Board (A8; A21-22) that Cibe Beaver, a predecessor in interest[9] to Ocinomled, opened the New York DELMONICO'S restaurant as of least May 13, 1998. (SW 21-22)

In reaching its conclusion, the Board rejected what it considered to be hearsay testimony and relied instead primarily on contemporary newspaper and magazine reports found to be admissible without authentication for what they show on their face. 37 C.F.R.§ 2.122(e). This included an article from *Time Out New York* dated "May 7-14, 1998" (A523) reporting prospectively that the restaurant will reopen on "Monday" (May 11, 1998) and a May 13, 1998 *New York Times* article (A526) reporting that the restaurant *had* opened on "Monday". The Board reasonably concluded that the May 13, 1998 date of the *New York Times* article, reporting in

---

[9] Southwestern refers to this as an attempt to "tack on" to the Cibe Beaver trademark rights. (SW7,21) This is an incorrect use of the term which generally is used to refer to an attempt to rely on prior versions of a mark that has been modified over time for trademark use priority purposes. See *Hana Financial, Inc. v. Hana Bank*, 200 U.S. 321, 135 S. Ct. 907 (2015).

the past tense, was a valid date to adopt for purposes of priority. The June 5,1998 *New York Times* article (A527-529) reviewing the food at the restaurant and the March 31, 1998 Certificate of Occupancy for the restaurant (A5651-5654; A5847-5848) provided further general support for the reasonableness of this conclusion.

The testimony of Milan Licul, a principal of Ocinomled, established that Ocinomled purchased the restaurant from Cibe Beaver in September of 1999 and paid a substantial amount for the goodwill of the restaurant which, Mr. Licul testified, represented payment for the acquisition of the DELMONICO'S name. The restaurant was in operation under the DELMONICO'S name at the time of the acquisition and there is no evidence to suggest it shut down at any period after May of 1998. Accordingly, Ocinomled submits that the Board's findings were reasonable, correct and in accord with the applicable Rules of Evidence.

## **CONCLUSION**

The findings made by the Board in concluding that the registration sought would create a likelihood of confusion are amply supported by the record and the conclusion is in accord with the intent and provisions of the applicable statute 15 USC 1052(d).  Accordingly, Ocinomled respectfully requests that the decision of the Board be affirmed.

Dated: Stamford, CT
        January 27, 2015


Respectfully submitted,


/s/Dickerson M. Downing
Dickerson M. Downing
        *Counsel of Record*
Law Offices of Dickerson M. Downing LLC
243 Tresser Boulevard, Floor 17
Stamford, CT 06901
Tel:  203 355-3620
ddowning@downingip.com

*Counsel for Appellee Ocinomled, Ltd.*

41

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C)(i), I hereby certify that this brief is proportionately spaced; uses a Roman-style, serif typeface (Times New Roman) of 14-point; and contains 9,247 words, exclusive of the material not counted under Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).


/s/ Dickerson M. Downing
Dickerson M. Downing
*Counsel for Appellee Ocinomled. Ltd.*

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:   Stamford, CT
         January 27, 2015

Respectfully submitted,

/s/Dickerson M. Downing
Dickerson M. Downing
*Counsel of Record*
Law Offices of Dickerson M. Downing LLC
243 Tresser Boulevard, Floor 17
Stamford, CT 06901
Tel:  203 355-3620
ddowning@downingip.com

*Counsel for Appellee Ocinomled, Ltd*